[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Lawson*, Slip Opinion No. 2021-Ohio-3566.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-3566

THE STATE OF OHIO, APPELLEE, *v*. LAWSON, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Lawson*, Slip Opinion No. 2021-Ohio-3566.]**

*Criminal law—Aggravated murder—Findings of guilt and death sentence affirmed.*

(No. 2019-0487—Submitted March 2, 2021—Decided October 7, 2021.)

APPEAL from the Court of Common Pleas of Lawrence County, No. 17-CR-333.

_____

KENNEDY, J.

{¶ 1} This is a death-penalty appeal as of right.

{¶ 2} On October 11, 2017, appellant, Arron L. Lawson, murdered four people: Stacey Holston, her eight-year-old son D.H., her mother, Tammie McGuire, and her mother's husband, Donald McGuire. On October 13, Lawson surrendered to police and confessed to the murders.

{¶ 3} The Lawrence County grand jury returned an 11-count indictment, including four counts of aggravated murder with multiple death specifications. Lawson entered guilty pleas to all counts and specifications of the indictment. Pursuant to R.C. 2945.06, a three-judge panel of the common pleas court heard the

state's evidence of guilt with regard to the capital charges. The panel found Lawson guilty of four counts of aggravated murder with multiple death specifications as to each count. The panel then conducted a sentencing hearing and sentenced Lawson to death for each aggravated murder.

{¶ 4} In this appeal, Lawson raises five propositions of law. We overrule each of the propositions of law. After conducting an independent review, we conclude that although significant mitigating factors exist, the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt as to each of the four aggravated murders. We further conclude that each death sentence is appropriate and proportionate. Therefore, we affirm all four death sentences.

## I. FACTS AND PROCEDURAL HISTORY

### A. Facts

{¶ 5} Arron Lawson was Stacey Holston's first cousin. Stacey lived with her husband, Todd Holston, and their sons, D.H. and two-year-old B.H., near Pedro, Ohio. Lawson lived nearby and was in the habit of visiting the Holstons daily.

{¶ 6} Lawson was infatuated with Stacey; he told his mother that she was "the love of his life." In his confession, he stated that he and Stacey had been having a sexual affair, which Stacey had broken off "[a]bout a week ago," i.e., approximately October 6, 2017.

{¶ 7} Lawson visited Stacey on Tuesday, October 10, 2017, the day before the murders, while Todd was at work. During this visit, Lawson surreptitiously entered a bedroom at the back of the house, opened a window, and inserted a book between the window and the sill to hold the window partly open. By his own later admission, he did this with the intention of entering the house the next day to commit murder.

{¶ 8} At about 7:15 p.m., when Todd came home, Lawson was still there with Stacey and the children. At Stacey's request, Todd drove Lawson home. Todd testified at trial that Lawson "wasn't too happy about" being sent home.

{¶ 9} The next morning, Todd left for work at approximately 4:30 a.m. About half an hour later, Lawson entered the Holstons' residence through the rear window. He had a 20-gauge shotgun, eight shells loaded with slugs, and a backpack containing flashlights, toilet paper, knives, a tarp, and other items. Lawson hid in the back bedroom until about 8:30 a.m.

{¶ 10} Meanwhile, D.H.'s school bus arrived and D.H. left the house to go to school. Stacey sent with him a note directing the school to put D.H. on a different bus that afternoon than he normally rode and to take him to his grandparents' house.

{¶ 11} By 8:30, after D.H. had left, Stacey was in the home with B.H. Stacey entered the back bedroom where Lawson was hiding, and Lawson shot her three times in the chest and shoulder. She fell to the floor.

{¶ 12} Lawson dragged her body to D.H.'s bedroom where he lifted her onto a futon bed and, using a condom, had sex with her corpse. Lawson discarded the condom in the kitchen wastebasket. He then returned to the bedroom and covered Stacey's body with a blanket and the futon's mattress.

{¶ 13} As these events were occurring, Todd was at a worksite in Maysville, Kentucky, where he clocked in at 6:43 a.m. It was Stacey's habit to send Todd a text message early every morning to make sure he had arrived safely at work. When she failed to do so on October 11, Todd began to worry. He repeatedly tried to call and text her throughout the day, but she did not respond.

{¶ 14} At 9:23 a.m., Lawson used Stacey's cell phone to call D.H.'s school. Posing as Todd, Lawson told the school's guidance secretary that D.H.'s grandfather was unable to watch D.H. that day, so D.H. should be taken home on his usual bus that afternoon. Lawson spoke calmly and gave the guidance secretary no reason to doubt he was who he claimed to be. Because Lawson was using Stacey's phone, the phone number on the school's caller ID matched the number on file in the office. So the original arrangement was canceled and D.H. was brought home after school. Meanwhile, Lawson waited at the Holstons' residence.

He fed B.H., changed his diaper, and later put him down for a nap in the main bedroom.

{¶ 15} When D.H. arrived home, Lawson sat with him in the living room and they talked about school. However, D.H. began asking Lawson where his mother was and when his father was coming home. Lacking answers, Lawson told D.H. that Lawson's PlayStation 3 was in D.H.'s room behind the dresser. D.H. went to his bedroom. As D.H. looked behind his dresser, Lawson shot him twice, once in the arm and once in the torso. Lawson left the boy's body where it fell and covered it with clothes. After killing D.H., Lawson continued to wait in the Holstons' residence.

{¶ 16} Around 6:30 or 6:40 p.m., Todd tried again to contact Stacey on his way home from his worksite. He then called Stacey's mother, Tammie McGuire, who lived about a quarter mile from the Holstons. Tammie agreed to check on Stacey and drove to the house. A few minutes later, she called Todd back and told him that she was at his house but that the door was locked. Todd authorized her to break in, and she did. The phone connection remained open. A few minutes later, Todd heard Tammie scream, "Oh, my God" followed by a loud noise. Then, as Todd later testified, "all of a sudden it was just quiet."

{¶ 17} By Lawson's account, he was in the main bedroom when he heard Tammie forcing her way into the house. He hid behind the bedroom door; when Tammie opened that door, he stepped out and shot her. Lawson dragged Tammie's body to the laundry area and threw a blanket over her. He then used her keys to move her truck behind the house.

{¶ 18} Meanwhile, Todd phoned Tammie's husband, Donald McGuire, and apprised him of the situation. Donald said he would go and check, and he walked to the house.

{¶ 19} According to Lawson, Donald initially tried to enter through the back door, but it was locked, so Donald went around to the locked front door and

"rammed through." When Donald came in, Lawson shot him and dragged the body to D.H.'s bedroom.

{¶ 20} About 10 to 20 minutes later, Todd arrived home. When he came through the front door, Lawson attacked him with a knife, stabbing him a number of times in the head, neck, and torso. Todd wrested the knife from Lawson and pinned him to the couch.

{¶ 21} Todd asked Lawson why he had attacked him. According to Lawson, he then replied, "I don't know, it was just a blind thing of anger." But Todd testified that Lawson had said, "There's been people breaking in out here, and I thought you was one of them." According to Todd, Lawson then "shook like he snapped out of something."

{¶ 22} Todd also asked Lawson where Stacey and the children were. Lawson said they were in the bedroom and were "okay." Todd testified that he then forcefully removed Lawson from the house. Lawson drove away in the truck belonging to the McGuires.

{¶ 23} Todd checked on B.H., who was unharmed. (According to Lawson, B.H. slept through at least the first three murders.) Todd then looked through the house. After finding the bodies of Tammie, Stacey, and Donald, he took B.H. and drove to the McGuires' house, where he borrowed a cell phone from Tammie's brother and called 9-1-1.

{¶ 24} Lawson had planned to hide out in the woods, but he had left his backpack and shotgun behind in the Holstons' house, so he drove to a store. With cash stolen from the Holstons, he bought new clothes to replace his bloodstained ones.

{¶ 25} While driving the truck, Lawson was pursued by police; he abandoned the truck and fled on foot. Eventually, he reached a wooded area, where he spent the next two nights. Lawson later said that after one "cold, cold night" in the woods, "I just didn't have no more flight in me." Nevertheless, he did not

emerge from the woods until the morning of October 13, when he was apprehended. Detectives took him to the county prosecutor's office in Ironton, where he confessed to the four murders.

{¶ 26} Dr. Robert Shott, the deputy Montgomery County coroner, performed autopsies on all four victims. He testified that Stacey suffered two shotgun wounds to the chest and one to the back, fatally injuring her heart and lungs. D.H. was shot twice, receiving fatal wounds to the heart, lung, and aorta. Tammie was shot once in the neck, fatally injuring her spinal cord, and once in the shoulder. Donald was shot once in the shoulder and once, fatally, in the chest.

## B. Procedural History

{¶ 27} On October 18, 2017, the grand jury indicted Lawson on four counts of aggravated murder with death specifications. Count 1 charged the aggravated murder of Stacey Holston with prior calculation and design, in violation of R.C. 2903.01(A). Count 1 carried three death specifications: course of conduct involving the purposeful killing of two or more persons, in violation of R.C. 2929.04(A)(5); felony murder, in violation of R.C. 2929.04(A)(7), predicated on aggravated burglary; and felony murder, in violation of R.C. 2929.04(A)(7), predicated on rape.

{¶ 28} Count 2 charged Lawson with the aggravated murder of D.H., a child under the age of 13, in violation of R.C. 2903.01(C). This count carried six death specifications: course of conduct, in violation of R.C. 2929.04(A)(5); murder of a victim younger than 13, in violation of R.C. 2929.04(A)(9); murder to escape detection, apprehension, trial, or punishment for other offenses, in violation of R.C. 2929.04(A)(3); felony murder, in violation of R.C. 2929.04(A)(7), predicated on aggravated burglary; felony murder, in violation of R.C. 2929.04(A)(7), predicated on kidnapping; and murder to prevent testimony, in violation of R.C. 2929.04(A)(8).

{¶ 29} Count 3 charged Lawson with the aggravated murder of Tammie McGuire during the commission of aggravated burglary, in violation of R.C. 2903.01(B). Count 4 charged Lawson with the aggravated murder of Donald McGuire during the commission of aggravated burglary, in violation of R.C. 2903.01(B). Counts 3 and 4 both carried four death specifications: a course of conduct, in violation of R.C. 2929.04(A)(5); murder to escape detection, apprehension, trial, or punishment for other offenses, in violation of R.C. 2929.04(A)(3); felony murder, in violation of R.C. 2929.04(A)(7), predicated on aggravated burglary; and murder to prevent testimony, in violation of R.C. 2929.04(A)(8).

{¶ 30} The indictment also included the following noncapital counts: Count 5, attempted murder, in violation of R.C. 2923.02(A) and 2903.02(A); Count 6, felonious assault, in violation of R.C. 2903.11(A)(2); Count 7, aggravated burglary, in violation of R.C. 2911.11(A)(2); Count 8, rape, in violation of R.C. 2907.02(A)(2); Count 9, abuse of a corpse, in violation of R.C. 2927.01(B); Count 10, kidnapping, in violation of R.C. 2905.01(A)(3); Count 11, tampering with evidence, in violation of R.C. 2921.12(A)(1); Count 12, theft of a motor vehicle, in violation of R.C. 2913.02(A)(1) and (B)(5); and Count 13, failure to comply with a police officer's order, in violation of R.C. 2921.331(B) and (C)(5)(a)(ii). Counts 1 through 4 and Counts 7, 8, and 10 carried firearm specifications.

{¶ 31} On February 21, 2019, the state voluntarily dismissed the R.C. 2929.04(A)(8) specifications that were attached to Counts 2, 3, and 4. Lawson then entered pleas of guilty to all remaining counts and specifications before the three-judge panel. Over the next few days, the three-judge panel heard witness testimony as required by R.C. 2945.06 and on February 25, 2019, unanimously found Lawson guilty of all counts of the indictment except Count 8 (rape) and of all specifications except the specification for felony murder predicated on rape that was attached to Count 1 (aggravated murder of Stacey).

{¶ 32} The panel then held a mitigation hearing pursuant to R.C. 2929.03(D)(1) beginning on February 26, 2019. After hearing the evidence that Lawson offered in mitigation, the panel sentenced him to death on all four counts of aggravated murder. He also received sentences totaling 59 years and six months on the noncapital counts and specifications. Lawson appeals of right and we now address his propositions of law.

## II. TRIAL COURT'S FAILURE TO ORDER A COMPETENCY HEARING

{¶ 33} Lawson initially pleaded not guilty to the indictment. More than a year later, he changed his mind, waived a jury trial, and entered guilty pleas to each count of the indictment and to all the death specifications (except the three that the state voluntarily dismissed). In so doing, he acted against his trial counsel's advice.

{¶ 34} Defense counsel never requested a hearing into Lawson's competence to stand trial. Nevertheless, in his first proposition of law, Lawson contends that the trial court had a constitutional duty to inquire into his competence to stand trial before accepting his change of plea.

### A. Relevant Facts

{¶ 35} On February 11, 2019, several days into the jury-selection process, defense counsel informed the trial court that Lawson did not want a trial. In chambers, one of Lawson's attorneys explained that Lawson did not want to put himself, his family, and the families of the victims through a full trial "with all of the gruesome photos that would be presented [and] all of the things that would be * * * said about him." Counsel said that he had explained to Lawson that if he entered a guilty plea, the case would proceed before a three-judge panel, not a jury.

{¶ 36} Defense counsel then observed:

I suppose * * * if he wants to do that, there's always a question of whether or not there needs to be an examination of his competence

to waive jury in a capital case. Obviously that's not something that we can [determine] today. And it may be something that would require a psychological evaluation, although in a capital case, I would ask for an independent one rather than what we would do in a typical case.

{¶ 37} One of the prosecutors noted that the defense team included a psychologist, Dr. Bob Stinson, and asked whether Dr. Stinson could render an opinion on Lawson's competence. Defense counsel replied that he could not "commit Dr. Stinson to being able to do that," because a competency assessment is "completely different" from a mitigation assessment. Nevertheless, defense counsel noted that Dr. Stinson "[o]bviously * * * would have more familiarity with [Lawson] than anyone else" and stated that he "assume[d] that it could be done in a manner"; he also stated that he had not "thought through whether that would create some sort of a conflict in terms of what [Dr. Stinson's] testimony would be in the mitigation phase."

{¶ 38} The trial judge then stated that he had "brought this up months ago on the potential for a competency evaluation" but that he had declined to order one because the defense had opposed it. (Any previous discussions of competency issues must have occurred off the record, as the transcript does not reflect any discussion of a competency evaluation before February 11.) The trial judge continued, "I'm now second-guessing myself that I should have [ordered] it over objection." Defense counsel remarked that the court was "not incorrect" in declining to order an evaluation over the defense's opposition. The prosecutor pointed out that the defense had not raised a question about Lawson's competence to stand trial.

{¶ 39} At the request of defense counsel, the court took a recess so that Lawson could discuss the matter with his family. When the session resumed,

defense counsel told the court at a bench conference that "after much thought, consideration, [and] discussion with family members and counsel," Lawson had decided not to change his plea and would proceed with a jury trial. The court then resumed the jury-selection process and the prospective jurors were brought into the courtroom.

{¶ 40} The next day, however, Lawson's counsel informed the trial court that Lawson had decided to waive his right to a jury trial and to enter a guilty plea to a three-judge panel. The trial court questioned Lawson at length about whether he understood that he was waiving his constitutional right to have a jury hear and decide the case. Lawson affirmatively stated a number of times that he understood the consequences of his decision.

{¶ 41} During this exchange, the trial court asked Lawson whether he had consulted with his family about his decision. Lawson answered that after consulting with his family the previous day, he "had a second thought throughout the night." He informed the trial court that "it was a little rough because I saw my mom crying and it always plays on my heart. And then after a while I have to make a better decision for my life and not somebody else's."

{¶ 42} The trial court accepted Lawson's waiver. Lawson's counsel then filed a written waiver of jury trial that Lawson had signed. Defense counsel certified in writing that they had consulted with Lawson, had explained his right to a jury trial, and believed that his waiver was voluntary, knowing, and intelligent. The trial court's acceptance of Lawson's jury waiver was also filed; it included the trial court's finding that the waiver was made "knowingly, intelligently and voluntarily." On February 19, 2019, the chief justice of this court assigned two additional judges to serve on the three-judge panel.

{¶ 43} On February 21, 2019, the panel held a change-of-plea hearing. At the hearing, defense counsel stated that they had discussed the change of plea with Lawson for about 90 minutes that day. Prior to proceeding to consider the change

of plea, the presiding judge asked counsel whether at any point they ever had any concerns about Lawson's having any "mental defect or mental deficiency * * * that would have prevented him from knowingly and intelligently and voluntarily entering into th[e] plea waiver"  One of Lawson's attorneys replied that based on his many years of experience with representing incompetent clients, his interactions with Lawson gave him "no reason to think that Mr. Lawson would fall into any of those categories."

{¶ 44} The presiding judge then asked whether defense counsel had "conducted appropriate investigation * * * into * * * mental issues or competency issues."  One of Lawson's attorneys replied that with Dr. Stinson's assistance, they had conducted such an investigation.  After lengthy discussions with Dr. Stinson, the attorney said, the defense had elected not to raise the issue of "possible incompetency to proceed in this matter."

## B.  The Trial Court's Duty to Inquire Into Competence

### 1. Historical perspective on the prohibition against the trial of incompetent defendants

{¶ 45} The fundamental principle that a criminal defendant who has been adjudicated to be legally incompetent shall not be required to stand trial has deep roots in common law.  *See Freeman v. People*, 4 Denio 9, 1847 WL 4116, *19 (N.Y.1847) (recognizing that new competency legislation "was not introductory" as it was "in strict conformity with the common law on the subject").  The prohibition against the trial of incompetent defendants "dates back at least to the time of [Sir William] Blackstone." *Godinez v. Moran*, 509 U.S. 389, 400, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), fn. 11.  In the eighteenth century, Blackstone wrote that if a man commits an offense and becomes "mad" after the commission of the offense, then he should not be arraigned for it "because he is not able to plead to it with that advice and caution that he ought."  4 William Blackstone, *Commentaries*

*on the Laws of England*, 24. Similarly, if he becomes "mad" after pleading, he should not be tried, "for how can he make his defense?" *Id.*

**{¶ 46}** The Supreme Court has long held that convicting a defendant while he is legally incompetent violates the United States Constitution. "[T]he conviction of an accused person while he is legally incompetent violates due process, and * * * state procedures must be adequate to protect this right." *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), citing *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956).

**{¶ 47}** R.C. 2945.37, which was first enacted in 1978, *see* Am.Sub.H.B. No. 565, 137 Ohio Laws, Part II, 2937, 2943-2946, sets forth the process that a defendant is due when an issue is raised pertaining to his competency. R.C. 2945.37(B) states:

> In a criminal action * * *, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before the trial has commenced, the court shall hold a hearing on the issue * * *. If the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion.

### 2. What Triggers a Trial Court's Duty to Inquire?

**{¶ 48}** A defendant is rebuttably presumed to be competent to stand trial. *State v. Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 56, citing R.C. 2945.37(G). "[A] competency determination is necessary only when a court has reason to doubt the defendant's competence." *Godinez*, 509 U.S. at 401, 113 S.Ct. 2680, 125 L.Ed.2d 321, fn. 13.

**{¶ 49}** Over 60 years ago, the now well-known test for determining legal competency to stand trial was announced in *Dusky v. United States*, 362 U.S. 402,

80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Agreeing with the solicitor general's argument, the Supreme Court explained that a trial court must inquire into whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Id*. at 402. This standard also applies when a court is determining a defendant's competency to plead guilty or waive his right to counsel. *Godinez* at 396, 398-399.

{¶ 50} We first recognized the *Dusky* competency test in *State v. Chapin*, 67 Ohio St.2d 437, 439-440, 424 N.E.2d 317 (1981), and have continued to apply it in the ensuing decades, *see State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 56 (stating that the *Dusky* test applies when assessing a defendant's competency to enter a guilty plea).

{¶ 51} Due process requires a court to hold a hearing when it has been presented with a "sufficient indicia of incompetence." *Drope v. Missouri*, 420 U.S. 162, 175, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). When the issue of competency is raised after a defendant's trial has commenced, R.C. 2945.37(B) directs that "the court shall hold a hearing on the issue only for good cause shown or on the court's own motion." We have construed the connotation of the phrase "good cause" to be "in accordance with the general principles set forth [by the Supreme Court] in *Drope* and *Pate*[,383 U.S. at 378, 86 S.Ct. 836, 15 L.Ed.2d 815]." *State v. Berry*, 72 Ohio St.3d 354, 360, 650 N.E.2d 433 (1995), citing *Chapin*. Therefore, "[t]he right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." *Berry* at 359, quoting *Drope* at 175.

### 3. Analysis

*a. Were there sufficient indicia of incompetence to require a hearing?*

**{¶ 52}** Lawson acknowledges that his counsel never asked for a competency evaluation, but he contends that the trial court denied him due process by not ordering one sua sponte. He contends that the record in this case establishes sufficient "indicia of incompetence" to require a hearing.

**{¶ 53}** Three facts, Lawson contends, called his competence into question. First, his decision to waive a jury trial and plead guilty to the indictment was made against the advice of his counsel. Second, he displayed "indecision," in that he changed his mind about pleading guilty. Third, at the time of his plea, he "was being treated with psychiatric medications," a fact he disclosed to the trial court during the plea colloquy.

**{¶ 54}** Lawson's acting against the advice of counsel does not indicate incompetence. We have noted that a defendant's "refusal to heed his counsel's advice * * * [does] not indicate that he was unable to understand the nature of the charges and proceedings or the gravity of the situation or that he could not assist in his defense." *State v. Johnson*, 112 Ohio St.3d 210, 858 N.E.2d 1144, 2006-Ohio-6404, ¶ 161. Indeed, such a refusal generally "evidences [the defendant's] ability to participate in his defense." *State v. Fletcher* 8th Dist. Cuyahoga No. 49814, 1985 WL 4215, *2 (Dec. 5, 1985).

**{¶ 55}** Nor does Lawson's alleged indecision suggest that he was incompetent. The record shows that after first expressing his desire to plead guilty on February 11, 2019, Lawson discussed the matter with his counsel and family and then decided not to change his plea. The next day, however, he filed his written jury waiver. The record does not show that he changed his mind again. On February 21, he still wished to plead guilty, and he did so without further hesitation.

**{¶ 56}** It is not surprising that a defendant contemplating entering a guilty plea in a capital case would display some hesitation. "Indecisiveness is not the

same as incompetency[,] however." *Johnson v. State*, 138 Md.App. 539, 567, 772 A.2d 1260 (2001). And Lawson's indecision does not amount to irrationality. *See United States v. Miller*, 531 F.3d 340, 348 (6th Cir.2008) (in determining competency, a court is to consider evidence of a defendant's irrational behavior). Lawson explained that he changed his mind due to the emotional toll he felt when, during a visit, his mom cried to him about his actions. However, once he distanced himself from those emotions and further reflected, he knew that the best decision for him was to change his not-guilty plea to a plea of guilty.

{¶ 57} In any event, Lawson's change of mind was brief. Having decided to plead guilty on February 12, he held to his decision in the face of his counsel's contrary advice and after a rigorous plea colloquy. And he continued to hold to his decision over the ensuing nine days and during the change-of-plea hearing before the three-judge panel. This sequence of events has no tendency to show that Lawson lacked the ability to consult with his lawyer with a reasonable degree of rational understanding, nor does it suggest that he was unable to understand the proceedings.

{¶ 58} Finally, Lawson cites his statement during the plea colloquy that he was taking prescription medication. The presiding judge asked Lawson whether he was "presently under the influence of any drug, alcohol, or mind-altering substance." Lawson replied: "I'm under prescription medication, but that is all." He stated that he was taking naproxen, Vistaril, metronidazole, and Zoloft.

{¶ 59} However, "it is a matter of statutory and decisional law that '[t]he fact that a defendant is taking antidepressant medication or prescribed psychotropic drugs does not negate his competence to stand trial.' " *Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, at ¶ 56, quoting *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 71; *see also State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 38; R.C. 2945.37(F) ("The court shall not find a defendant incompetent to stand trial solely * * * because the

defendant is receiving or has received psychotropic drugs or other medication, even if the defendant might become incompetent to stand trial without the drugs or medication").

**{¶ 60}** In both *Mink* and *Ketterer*, as Lawson points out, "competency evaluations were conducted * * * before each defendant entered his guilty plea to capital charges." *Montgomery* at ¶ 54, citing *Mink* at ¶ 31-32 and *Ketterer* at ¶ 67. Nevertheless, *Mink* and *Ketterer* do not stand for the proposition "that a court *must* order a competency hearing before accepting a guilty plea from a capital defendant who is taking a prescription medication for mental illness." (Emphasis sic.) *Montgomery* at ¶ 54. And in *Montgomery*, we expressly declined to so hold. *Id.*

**{¶ 61}** Lawson stated during the colloquy that his medications did not prevent him from understanding what his attorneys or the court said to him, nor did they affect his ability to fully and adequately assist his attorneys. The trial court also asked Lawson if there was any medication that he had been prescribed but was not taking; he said no. Moreover, during the plea colloquy, Lawson "appropriately answered the court's questions," *Montgomery* at ¶ 57, and displayed no "outrageous, irrational or confused" behavior, *id.* at ¶ 59.

**{¶ 62}** The presiding judge asked Lawson's counsel whether they had seen any indication that Lawson's medications "could be affecting his ability to reason or [his] judgment." Both attorneys replied in the negative. "Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). Lawson's counsel knew that Lawson was taking medication, "yet they had no concerns about his competence." *Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, at ¶ 51. The record contains no countervailing evidence—nothing to suggest that the medications Lawson was taking could have hampered his ability to understand the proceedings or assist his counsel.

{¶ 63} Finally, after Lawson informed the court that he was taking prescription medication, the trial court conducted a full plea colloquy under Crim.R. 11. The panel asked Lawson whether he understood the constitutional rights he was waiving by pleading guilty, the consequences of his pleading guilty, and the maximum sentence he could potentially receive if found guilty of the capital specifications. The panel had previously verified that he understood the written plea of guilty and had executed it with the assistance of his counsel. The panel asked Lawson whether he understood each of the charges against him. Lawson "answered each of the panel's questions in the affirmative and in a coherent fashion." *Montgomery* at ¶ 50.

{¶ 64} Trial counsel's statements to the trial court are also important in considering whether the trial court violated Lawson's due-process rights by failing to initiate a competency hearing. "Trial counsel's assurances to the court are relevant because 'a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings.' " *Stanley v. Cullen*, 633 F.3d 852, 861 (9th Cir.2011), quoting *Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir.1991). The Supreme Court has recognized that "judges must depend to some extent on counsel to bring issues into focus." *Drope*, 420 U.S. at 176-77, 95 S.Ct. 896, 43 L.Ed.2d 103. Lawson's defense counsel never asserted their belief that Lawson was incompetent. In fact, lead defense counsel stated just the opposite. Counsel indicated that the trial court was correct in declining to order a competency evaluation. He told the court that he had spent "many hours" with Lawson over a 17-month period and had discussed Lawson's competence with Dr. Stinson, and lead defense counsel expressly stated that he had "no reason to think" that Lawson was incompetent to enter a guilty plea. "[W]hen a trial court must decide whether to hold a hearing on the defendant's competence to stand trial, reviewing courts 'give weight * * * to the trial judge's opportunity to observe the defendant.' " *State v. Cowans*, 87 Ohio St.3d 68, 84, 717 N.E.2d 298 (1999), quoting *Commonwealth*

*v. Hall*, 15 Mass.App. 1, 3, 443 N.E.2d 121 (1982). In this case, the presiding judge had observed Lawson's in-court demeanor for months and was able to observe his demeanor during the plea colloquy. Indeed, "it is noteworthy that *nobody* on the spot thought [Lawson's] behavior raised any question as to his competence." (Emphasis sic.) *Cowans* at 84; *accord State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 63; *Montgomery* at ¶ 59.

{¶ 65} Under all the circumstances here, the facts that Lawson cites as indicia of incompetence were insufficient to overcome the general presumption of competence and were insufficient to entitle him to a competency evaluation.

*b. Did the trial court raise the issue of competency?*

{¶ 66} Lawson contends that "the [trial] court itself effectively raised the issue" of his competence—presumably on February 11, 2019, when the court wondered out loud whether it should have ordered a competency hearing earlier in the case over the defense's objections. Lawson relies on *State v. Bock*, 28 Ohio St.3d 108, 110, 502 N.E.2d 1016 (1986), in which this court stated: "[T]here is no question that where the issue of the defendant's competency to stand trial is raised prior to the trial, a competency hearing is mandatory." *See also* R.C. 2945.37(B). Lawson's argument is not clear, but he seems to imply that a competency hearing was required under *Bock* because the trial court itself had "raised" the issue of competence.

{¶ 67} We disagree. While a trial court may raise the issue of a defendant's competency, *see* R.C. 2945.37(B), the trial court in this case was not exercising this authority. In essence, the trial court was asking the defense whether it wanted a competency hearing. Asking the defense whether it wants a hearing does not by itself make a hearing mandatory. The fact that the trial court did not order a competency evaluation and hearing, when it had the authority to sua sponte do so, shows that the court did not intend to raise the issue of Lawson's competence. Moreover, even if a competency hearing were mandatory under *Bock*, the failure to

hold one would be harmless error in this case: "[I]t is clear that the failure to hold a mandatory competency hearing is harmless error where the record fails to reveal sufficient indicia of incompetency." *Bock* at 110.

### 4. No support for the dissent's per se rule

{¶ 68} As set forth above, the Supreme Court has established, and Ohio has adopted, specific procedures to adequately protect an incompetent defendant from being tried or convicted. The dissent, however, advocates for the adoption of a per se rule—that a competency examination and hearing are required at the instant in which a capital defendant pursues an adverse-interest request, such as entering a plea of guilty.

{¶ 69} There is no compelling reason to adopt that per se rule. As the Fifth Circuit has held:

> [W]e decline to adopt a per se rule that, as a matter of law, a trial court must doubt a capital punishment defendant's competency, or conclude that such defendant does not understand the proceedings against him or appreciate their significance, or conclude that he cannot rationally aid his attorney in his defense simply because it is obvious to the court that the defendant is causing his trial to be conducted in a manner most likely to result in a conviction and the imposition of the death penalty.

*Roberts v. Dretke*, 381 F.3d 491, 498 (5th Cir.2004).

{¶ 70} A per se rule is also incongruous with the Supreme Court's position that there is no one sign that triggers the need for a competency evaluation.

> [E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are

all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. *There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.* That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

(Emphasis added.) *Drope*, 420 U.S. at 180, 95 S.Ct. 896, 43 L.Ed.2d 103.

{¶ 71} For the foregoing reasons, we overrule Lawson's first proposition of law.

### III. VALIDITY OF LAWSON'S JURY WAIVER AND GUILTY PLEAS

{¶ 72} In his second proposition of law, Lawson contends that both his jury waiver and his subsequent guilty pleas were invalid because they were not knowing, voluntary, and intelligent. This proposition essentially restates the claims made in his first proposition of law; the same three circumstances that the first proposition calls "indicia of incompetence" are here relied upon as reasons to question the knowing, voluntary, and intelligent character of his jury waiver and guilty pleas. Lawson also argues that before accepting his waiver and pleas, the trial court should have advised him that a single juror could prevent a death sentence. For the reasons that follow, we reject both claims.

### A. The Jury Waiver

{¶ 73} "In addition to determining that a defendant who seeks to plead guilty * * * is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Godinez*, 509 U.S. at 400, 113 S.Ct. 2680, 125 L.Ed.2d 321. The United States Supreme Court has explained the

distinction between a competency determination and an inquiry into the knowing and voluntary character of a rights waiver as follows:

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. * * * The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced.

(Emphasis sic.) *Id.* at 401, fn. 12, quoting *Parke v. Raley*, 506 U.S. 20, 28, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992).

{¶ 74} A jury waiver must be voluntary, knowing, and intelligent. *E.g.*, *State v. Ruppert*, 54 Ohio St.2d 263, 271, 375 N.E.2d 1250 (1978). Waiver may not be presumed from a silent record; however, if the record shows that a jury waiver occurred, the verdict will not be set aside except on a plain showing that the waiver was not freely and intelligently made. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268 (1942). Moreover, a written waiver is presumptively voluntary, knowing, and intelligent. *United States v. Sammons*, 918 F.2d 592, 597 (6th Cir.1990). *See generally State v. Bays*, 87 Ohio St.3d 15, 19, 716 N.E.2d 1126 (1999).

{¶ 75} In this case, Lawson executed and filed a written jury waiver. Attached to the waiver was the following certification by defense counsel:

> We, the undersigned, as counsel for defendant Arron Lawson, have consulted with our client, explained his Constitutional rights to a trial by jury, and made inquiry to determine if his decision * * * was based upon any promises or coercive tactics * * * and

explained to him the process of trial by three-judge panel.  We find
no evidence of any promises or coercive tactics * * *.  We recognize
that his waiver of jury trial is voluntary.  And we believe his waiver
is knowingly and intelligently made.

{¶ 76} By itself, the fact that a defendant is taking prescription medications "does not defeat the presumption that his written waiver was knowing, intelligent, and voluntary."  *Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, at ¶ 30.  Lawson points to nothing to show "that he, in fact, failed to understand the waiver proceedings or the effect of his decision to waive—or that his decision was somehow involuntary—because of the prescription medications."  *Id*.

### B.  The Guilty Pleas

{¶ 77} "Prior to accepting a guilty plea from a criminal defendant, the trial court must inform the defendant that he is waiving his privilege against compulsory self-incrimination, his right to jury trial, his right to confront his accusers, and his right of compulsory process of witnesses."  *State v. Ballard*, 66 Ohio St.2d 473, 423 N.E.2d 115 (1981), paragraph one of the syllabus, following *Boykin v. Alabama*, 395 U.S. 238, 242-243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *see also* Crim.R. 11(C)(2)(c).

{¶ 78} In this case, the trial court complied with *Ballard* and Crim.R. 11(C)(2)(c) by informing Lawson that his guilty plea waived his rights to confront the state's witnesses, to compel the attendance of witnesses, and to require the state to prove guilt beyond a reasonable doubt at a trial in which he would have had the right not to testify against himself.

{¶ 79} Lawson initiated the decision to plead guilty, "insisted upon it against advice of counsel, and held to it through a lengthy plea colloquy," *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 40.  In

22

*Fitzpatrick*, this court concluded on similar facts that it was "clear" that a capital defendant's decision to plead guilty was voluntary. *Id.*

{¶ 80} Nevertheless, Lawson contends that his plea was not voluntary, knowing, and intelligent, because (1) the trial court did not inquire into why he was not following counsel's advice, (2) the trial court did not inquire more deeply into the nature and effects of the medications Lawson was taking, and (3) the trial court accepted the waiver and pleas without a hearing on Lawson's competence.

{¶ 81} Lawson argues that when a defendant chooses, contrary to his counsel's advice, to waive a jury trial or plead guilty, the trial court has a duty to inquire into the reasons for the defendant's decision. But he cites no authority for that position.

{¶ 82} The decisions whether to waive a jury trial and whether to plead guilty belong to the defendant, not counsel. *See Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). A defendant's election to exercise his right to reject his counsel's advice does not imply that his decision could not have been knowing, voluntary, and intelligent. To draw such an inference would negate the defendant's right to decide these matters for himself.

{¶ 83} Lawson also asserts that his decision to reject counsel's advice was "essentially" equivalent to waiving the right to counsel altogether. We reject this assertion; there is an obvious difference between Lawson's situation—having the assistance of counsel, but rejecting counsel's advice—and having no counsel at all.

{¶ 84} Lawson also argues that the trial court failed to conduct a sufficient inquiry into the prescription drugs he was taking. He contends that the trial court should have asked what the medications were for, who prescribed them, how long Lawson had been taking them, when he had taken them last, and what effects they may have had on his mental state.

{¶ 85} Lawson cites *Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, at ¶ 66, in which this court stated: "Additional inquiry is necessary

into a defendant's mental state once a defendant seeking to enter a guilty plea has stated that he is under the influence of drugs or medication."

{¶ 86} However, in *Montgomery*, we rejected a similar claim on similar facts. The defendant in *Montgomery* argued that the three-judge panel inadequately inquired "into the effect, if any, that his prescription medications had on his mental state." *Id.*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, at ¶ 44.

{¶ 87} When the presiding judge in *Montgomery* learned at the jury-waiver hearing that the defendant was taking prescription medications for mental illness, the judge asked "whether he had been prescribed the medications and whether he was taking them pursuant to the prescription." *Id.* at ¶ 49. The judge also "directly asked him whether he understood the constitutional rights he was forgoing by waiving his right to a jury, whether he was doing so voluntarily, and whether his counsel had reviewed the jury waiver with him prior to the hearing." *Id.* The panel later conducted a plea colloquy that complied with Crim.R. 11, and "Montgomery answered each of the panel's questions in the affirmative and in a coherent fashion." *Id.* at ¶ 50.

{¶ 88} Moreover, "[t]he panel had no reason to believe that Montgomery had any issues with competence or could not intelligently and voluntarily enter a guilty plea." *Id.* at ¶ 47. Neither the defendant nor counsel in *Montgomery* "ever made any representation to the court that he had any * * * issues with competency." *Id.* The panel specifically asked at the plea hearing

whether [defense counsel] had any reason to believe that [Montgomery] was not competent or capable of voluntarily and intelligently pleading guilty. Defense counsel * * * were aware that Montgomery was medicated for depression, yet they * * * never raised an issue to the court about Montgomery's ability to

understand the proceedings and enter a knowing and voluntary guilty plea.

*Id.* at ¶ 51.

{¶ 89} In the end, "there [was] no evidence * * * that Montgomery was not in full possession of his faculties at the plea hearing or at any other point during the pendency of his case." *Id.*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, at ¶ 52. Accordingly, we determined that "the panel's inquiry into Montgomery's mental state and use of prescription medications and in its acceptance of Montgomery's guilty plea was adequate and that Montgomery voluntarily and knowingly pleaded guilty to capital murder." *Id.*

{¶ 90} The facts of this case closely parallel those of *Montgomery*. During the plea colloquy, the trial court asked Lawson whether his medications prevented him from understanding what his attorneys or the court told him and whether they affected his ability to fully and adequately assist his attorneys. The trial court also asked Lawson's counsel whether they had seen any indication that Lawson's medications were affecting his reasoning ability or judgment. Neither Lawson nor his counsel indicated at any point "that he had any * * * issues with competency," *Montgomery* at ¶ 47. Moreover, as in *Montgomery*, the panel in this case conducted a plea colloquy that complied with Crim.R. 11, and Lawson "answered each of the panel's questions in the affirmative and in a coherent fashion," *id.* at ¶ 50.

{¶ 91} "In short, there is no evidence in the record to indicate that [Lawson] was not in full possession of his faculties at the plea hearing or at any other point during the pendency of his case." *Id.* at ¶ 52. "[C]onsidering the totality of the evidence," *id.*, the panel's inquiry into Lawson's mental state and use of prescription medications was sufficient to comply with *Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064.

### C. Failure to Advise that Single Juror Can Block Death Sentence

{¶ 92} Lawson contends that his jury waiver and guilty pleas were not voluntary, knowing, and intelligent because the trial court did not tell him that a single juror can block a death sentence. However, we have rejected that contention. *Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, at ¶ 30, citing *Bays*, 87 Ohio St.3d at 19-21, 716 N.E.2d 1126; *see also Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 NE.2d 927, at ¶ 42-48; *Sowell v. Bradshaw*, 372 F.3d 821, 833 (6th Cir.2004). We reject it again today.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

{¶ 93} In his third proposition of law, Lawson contends that his trial counsel rendered ineffective assistance. To establish ineffective assistance, Lawson must show (1) deficient performance, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

### A. Failure to Request a Competency Evaluation

{¶ 94} Lawson argues that his counsel should have requested a competency evaluation, which would have led to a competency hearing.

{¶ 95} R.C. 2945.37(B) entitles the defense to a pretrial competency hearing upon request: "In a criminal action in a court of common pleas, * * * the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before the trial has commenced, the court *shall* hold a hearing on the issue as provided in this section." (Emphasis added.) Defense counsel is not ineffective in failing to request that the trial court order a competency evaluation or hold a competency hearing when the defendant does not display

26

sufficient indicia of incompetency to warrant a competency hearing. *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 41.

**{¶ 96}** Lawson contends that counsel's decision not to request a competency evaluation cannot be justified as a strategic decision, because requesting an evaluation would have had no possible "downside."

**{¶ 97}** Lawson's assertion that there is no downside to requesting a competency evaluation in this type of situation is questionable: defense counsel may risk straining their relationship with their client when they question his mental competence and seek to negate his decisions. But in any event, competent counsel would not request an evaluation unless they had some reason to doubt the defendant's competence. Here, nothing in the record shows that Lawson's counsel had any such reason.

**{¶ 98}** Lawson contends that his counsel did not adequately investigate the competency issue before declining to request a competency evaluation. He argues that an expert opinion on Lawson's competence was essential, because counsel's "armchair opinions" were not a sufficient basis on which to make such a decision. He further argues that the record fails to show that defense counsel ever sought an expert opinion.

**{¶ 99}** Lawson points to defense counsel's dialogue with the trial court on February 11, 2019, the day Lawson first announced that he wanted to waive a jury and plead guilty. One of the prosecutors asked whether Dr. Stinson could render an opinion on competence based on conversations Dr. Stinson and Lawson had already had. One of Lawson's attorneys replied:

> I can't commit Dr. Stinson to being able to do that. I know psychologists that I have worked with in the past would probably say, "Well, that's a completely different review and assessment," and they're looking for different things than the context of

presenting possible psychological information for purposes of mitigation.

Obviously [Dr. Stinson] would have more familiarity with this young man than anyone else, and so I assume that it could be done in a manner, although I * * * haven't thought through whether that would create some sort of a conflict in terms of what his testimony would be in the mitigation phase.

**{¶ 100}** Lawson reads this statement as indicating "the limited scope of Dr. Stinson's services[,] which did not include a competency examination." But defense counsel did not say that Dr. Stinson *could not* render such an assessment. He said only that he could not guarantee that Dr. Stinson would be able to form an opinion of Lawson's competence based on the interviewing Dr. Stinson had done up to that point. Indeed, counsel went on to say that Dr. Stinson "would have more familiarity with [Lawson] than anyone else, and so *I assume that it could be done* in a manner." (Emphasis added.)

**{¶ 101}** Lawson goes on to assert that "there is nothing in the record that indicates that Dr. Stinson or any other mental health professional did, or was even asked to do, a competency evaluation on" Lawson. Lawson's argument misplaces the burden of persuasion: a defendant who claims ineffective assistance of trial counsel on direct appeal must show from the record that the elements of the claim exist. Therefore, Lawson must show that his counsel failed to perform an adequate investigation of his possible incompetence. *See, e.g.*, *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244.

**{¶ 102}** Lawson also ignores what defense counsel said during the plea hearing on February 21. During that hearing, one of Lawson's attorneys expressly stated that counsel had conducted an investigation into competency issues and that they had consulted Dr. Stinson:

JUDGE BALLARD: * * * [A]t any point did you ever have any concerns that might be raised by Adkins [sic, *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)], or any mental defect or mental deficiency that could have been identified in Mr. Lawson that would have prevented him from knowingly and intelligently and voluntarily entering into this plea waiver?

MR. MCVAY [defense counsel]: Not being a psychologist or a psychiatrist * * * I'm not in a position * * * to technically answer that. But based on my many years of experience and 24 years as a practicing attorney handling a substantial number of death penalty cases * * * and having had clients who would be Adkins-qualified or otherwise incompetent to enter a plea, * * * I have no reason to think that Mr. Lawson would fall into any of those categories at this point in time based upon my discussions with him and many hours spent with him, over 17 months, as well as the time spent with him today.

(Capitalization sic.)

{¶ 103} The presiding judge then asked counsel: "[I]s it safe for this panel to assume that you conducted appropriate investigation from your practice into any issue that would be addressed by Adkins or mental issues or competency issues?" Counsel replied:

*We did*, your Honor. In keeping with the American Bar Association Guidelines for the Representation of Defendants Charged with Capital Crimes and their recommendation, if not insistence, that we *engage a forensic psychologist to* work with *and*

*examine the defendant* in the course of our representation, * * * *that in fact has been done*. * * *

Having said that, and *having discussed matters with * * * Dr. Stinson at length*, I think I can fairly represent that by virtue of the fact that we have not filed any pleadings pertaining to a possible incompetency to proceed in this matter * * *, I feel that we're on safe ground in that respect in the sense that we have done our due diligence with regard to that * * *. *We have looked into all of those matters*, discussed most, * * * I would suggest all of those matters with Mr. Lawson. I believe that we're on solid ground to move forward with what his intentions are at this point in time.

(Emphasis added.) This statement indicates that Dr. Stinson examined Lawson and that defense counsel consulted Dr. Stinson in determining whether to further pursue the issue of Lawson's competence. Lawson cites nothing in the record that either contradicts counsel's representations or shows that the investigation that had been conducted was deficient.

{¶ 104} Finally, Lawson is unable to show prejudice resulting from counsel's declining to request a competency evaluation. It is true that if Lawson's counsel had requested an evaluation, the trial court would have been required by statute to order one. But that says nothing about the likely *outcome* of the evaluation and of the hearing. To show prejudice, Lawson must show that there is a reasonable probability that an evaluation "would have revealed that he was incompetent to stand trial," *Alexander v. Dugger*, 841 F.2d 371, 375 (11th Cir.1988).

{¶ 105} As we concluded in relation to Lawson's first proposition of law, the record simply contains insufficient indicia of incompetence to require a competency evaluation or a competency hearing. If defense counsel had requested

a competency evaluation, the trial court would have had to hold a hearing. But the alleged indicia of incompetence that Lawson repeatedly cites would have been insufficient to overcome the legal presumption of competence, because they do not suggest that Lawson was incapable of understanding the nature and objective of the proceedings against him or of assisting in his own defense. The record of the penalty phase contains numerous references to Lawson's mental-health history, including diagnoses of bipolar disorder, depression, and posttraumatic-stress disorder ("PTSD"). However, "[i]ncompetency must not be equated with mere mental or emotional instability or even with outright insanity. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *Bock*, 28 Ohio St.3d at 110, 502 N.E.2d 1016. Accordingly, the record does not show a reasonable likelihood that the trial court would have found Lawson incompetent to stand trial.

### B. Failure to Argue Mercy As a Mitigating Factor

{¶ 106} In another part of his third proposition of law, Lawson contends that his counsel were ineffective because they failed to renew a pretrial motion to instruct the jury on mercy as a mitigating factor and because they did not argue during the penalty phase that mercy was a mitigating factor.

{¶ 107} As the state points out, any issues concerning jury instructions became moot once Lawson waived a jury trial. However, Lawson also contends that counsel rendered ineffective assistance by failing to argue before the three-judge panel that mercy is a mitigating factor. That facet of his claim is obviously not rendered moot by Lawson's jury waiver.

{¶ 108} However, the claim lacks merit, as we have repeatedly held that mercy is not a mitigating factor. *See, e.g.*, *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 88; *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 253. Hence, counsel did not perform deficiently by declining to argue otherwise. "Defense counsel is not required to advance

arguments lacking merit. * * * It is not ineffective assistance for a trial lawyer to maneuver within the existing law, declining to present untested or rejected legal theories." *State v. McNeill*, 83 Ohio St.3d 438, 449, 700 N.E.2d 596 (1998).

{¶ 109} Lawson also fails to show prejudice. Defense counsel in this case presented extensive mitigating evidence focused on Lawson's dysfunctional family and upbringing, his alleged abuse, traumatic events in his life, and his diagnosed mental disorders. Their penalty-phase arguments to the panel concentrated on that evidence. Lawson does not explain how adding an express plea for mercy would have been reasonably likely to make a difference in the penalty-phase outcome.

{¶ 110} We overrule Lawson's third proposition of law.

## V. SENTENCING OPINION

{¶ 111} In his fourth proposition of law, Lawson contends that errors in the panel's sentencing opinion require that we vacate his death sentences. He contends that the panel improperly weighed nonstatutory aggravating circumstances against him and improperly discounted the mitigating factors. We disagree.

### A. Nonstatutory Aggravating Circumstances

{¶ 112} The trial court's 12-page sentencing opinion begins with a statement of facts. According to Lawson, the opinion includes several facts that "made the crime particularly disturbing" and could only "be termed as inflammatory." Lawson contends that by mentioning these facts in the opinion, the panel "employed" them as nonstatutory aggravating circumstances.

{¶ 113} The "inflammatory" facts Lawson refers to include the following: that Lawson had sexual intercourse with Stacey's body after shooting her, that Stacey had recently ended a sexual relationship with Lawson, that Lawson posed as D.H.'s father to deceive D.H.'s school into sending him home that day, that Lawson "tricked" D.H. into entering the bedroom and shot him twice at close range, that Lawson prepared in advance for the murders by propping a window open the

night before, that he moved and covered the bodies, and that he was arrested two days later "[a]fter a manhunt."

{¶ 114} But a trial court does not "create nonstatutory aggravating circumstances" merely by "discussing the facts of the crime." *State v. Robb*, 88 Ohio St.3d 59, 82, 723 N.E.2d 1019 (2000). Moreover, the sentencing opinion here correctly identified the aggravating circumstances of which Lawson was found guilty as to each aggravated-murder count. When a trial court has correctly identified the statutory aggravating circumstances pleaded and proved at trial, we presume that the trial court understood the difference between statutory aggravating circumstances and the facts that describe the nature and circumstances of the offense. *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 137.

{¶ 115} Lawson points to nothing in the opinion that suggests that the panel used the facts as nonstatutory aggravating circumstances. Instead, he contends that the opinion fails to affirmatively state that the facts were *not* so used, and he argues that this failure suffices to rebut the presumption that the trial court considered only the aggravating circumstances to which Lawson pleaded guilty. However, the opinion does specifically state that the panel did not consider Lawson's alleged affair with Stacey or the other "offenses charged in the indictment," which would include his abuse of Stacey's corpse, as aggravating circumstances.

{¶ 116} Lawson's argument is inconsistent with our precedent. The opinion "identified only the applicable statutory aggravating circumstances * * * and listed no improper nonstatutory aggravating circumstances. Therefore, [Lawson] has not rebutted the presumption that the court relied only upon the aggravating circumstances it identified." *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 121.

### B. Unconsidered or Improperly Discounted Mitigation

{¶ 117} Lawson also contends that the panel's sentencing opinion "contains weighing errors" that violate the Eighth Amendment as construed in *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion), and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The United States Supreme Court in *Eddings* held that the sentencer in a capital case may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence." (Emphasis sic.) *Id.* at 114. Lawson contends that the trial court failed to consider some mitigating factors and gave too little weight to others.

{¶ 118} Lawson contends that the trial court failed to consider Dr. Stinson's testimony bearing on the mitigating factor of Lawson's youth, R.C. 2929.04(B)(4). Because Lawson was 23 years old when he committed the murders, the trial court gave little weight to this factor. However, the sentencing opinion does not discuss Dr. Stinson's testimony that the human brain does not finish developing until a person reaches his mid-20s; in particular, Dr. Stinson testified that this is true of the frontal lobe, which is responsible for "judgment, reasoning, impulse control, [and] planning." Because the trial court's opinion does not discuss this testimony, Lawson asks us to infer that the panel did not consider it.

{¶ 119} But "[w]hile a sentencing court must consider all evidence of mitigation, it need not discuss each factor individually." *State v. Phillips*, 74 Ohio St.3d 72, 102, 656 N.E.2d 643 (1995). A trial court's failure to discuss each mitigating factor in its opinion does not give rise to an automatic inference that factors that were not discussed in the opinion were not considered. *Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, at ¶ 125, citing *State v. Roberts*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, ¶ 54.

{¶ 120} Such an inference is warranted only in "unusual circumstances," *Roberts* at ¶ 64, and Lawson points to no such circumstances here. In *Roberts*, the defendant's allocution contained "potentially significant mitigation," *id.*, and "was

the *only* relevant matter * * * specifically placed before the trial court as mitigation" (emphasis sic), *id.* at ¶ 56; in those circumstances, the trial court's failure to mention the allocution in the sentencing opinion warranted the inference that the court had failed to consider the allocution. But in this case, as in *Obermiller*, the sentencing opinion "discussed multiple mitigating factors," *Obermiller* at ¶ 126. Therefore, the inference that the trial court failed to consider Dr. Stinson's testimony is not justified.

{¶ 121} Lawson also contends that the trial court erred by "unreasonably discount[ing]" or giving "insufficient consideration to" his mitigating evidence going to various other factors—i.e., assigning it no weight or insufficient weight. Lawson contends that a trial court violates the holding in *Eddings* and the Eighth Amendment by assigning insufficient weight to a defendant's mitigation.

{¶ 122} As we have explained, this reading of *Eddings* is incorrect because, as stated in *Harris v. Alabama*, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), "the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer." The weight to be given to any mitigating factor is " 'an individual decision by the fact finder,' " not a matter of law. *State v. Davis*, 139 Ohio St.3d 122, 2014-Ohio-1615, 9 N.E.3d 1031, ¶ 62, quoting *State v. Richey*, 64 Ohio St.3d 353, 369-370, 595 N.E.2d 915 (1992), *abrogated in part on other grounds, see State v. McGuire*, 80 Ohio St.3d 390, 402-403, 686 N.E.2d 1112 (1997).

{¶ 123} Quoting *Porter v. McCollum*, 558 U.S. 30, 42, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009), Lawson describes it as a case in which the United States Supreme Court held that a state supreme court " 'either did not consider or unreasonably discounted the mitigation evidence' adduced in a post-conviction hearing." But "*Porter* does not stand for the proposition that the Eighth Amendment forbids a sentencer to 'discount' mitigating evidence introduced at the penalty phase of the trial." *Davis* at ¶ 65.

{¶ 124} Therefore, we overrule Lawson's fourth proposition of law.

## VI. SETTLED ISSUES

{¶ 125} Lawson's fifth proposition of law raises various oft-rejected arguments against the constitutionality of the death penalty and the Ohio statutes governing its imposition and also raises similar arguments that the death penalty violates international law. *See*, *e.g*., *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 106, 109-120; *State v. Jenkins*, 15 Ohio St.3d 164, 169-174, 473 N.E.2d 264 (1984). We summarily overrule this proposition of law. *See generally State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568 (1988), syllabus; *State v. Spisak*, 36 Ohio St.3d 80, 81, 521 N.E.2d 800 (1988).

## VII. INDEPENDENT SENTENCE REVIEW

{¶ 126} Under R.C. 2929.05, we must independently review Lawson's death sentences. R.C. 2929.05(A) requires that we determine (1) whether the evidence supports the trier of fact's finding of aggravating circumstances, (2) whether the aggravating circumstances of which the defendant was found guilty outweigh the mitigating factors beyond a reasonable doubt, and (3) whether the death sentences are proportionate to those affirmed in similar cases.

### A. Aggravating Circumstances

{¶ 127} The aggravated murder of Stacey Holston (Count 1) has two aggravating circumstances: course of conduct (R.C. 2929.04(A)(5)), and a felony-murder circumstance predicated on aggravated burglary (R.C. 2929.04(A)(7)).

{¶ 128} The aggravated murder of D.H. (Count 2) has five aggravating circumstances: murder of a victim under age 13 (R.C. 2929.04(A)(9)); murder committed to escape detection, apprehension, trial, or punishment for another offense (R.C 2929.04(A)(3)); course of conduct; felony murder predicated on aggravated burglary; and felony murder predicated on kidnapping.

{¶ 129} The aggravated murder of Tammie McGuire (Count 3) has three aggravating circumstances: course of conduct; murder to escape detection,

apprehension, trial, or punishment; and felony murder predicated on aggravated burglary.

{¶ 130} The aggravated murder of Donald McGuire (Count 4) has three aggravating circumstances: course of conduct; murder to escape detection, apprehension, trial, or punishment; and felony murder predicated on aggravated burglary.

{¶ 131} The evidence in the record, including Lawson's confession, supports the panel's finding as to each of the aggravating circumstances.

### B. Mitigating Factors

{¶ 132} Against these aggravating circumstances, we must weigh any of the relevant mitigating factors provided in R.C. 2929.04(B). These factors include

- the nature and circumstances of the offense, R.C. 2929.04(B),

- the history, character, and background of the offender, R.C. 2929.04(B),

- whether the victim of the offense induced or facilitated it, R.C. 2929.04(B)(1),

- whether it is unlikely that the offense would have been committed but for the fact that the offender was under duress, coercion, or strong provocation, R.C. 2929.04(B)(2),

- whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law, R.C. 2929.04(B)(3),

- the youth of the offender, R.C. 2929.04(B)(4),

- the offender's lack of a significant history of prior criminal convictions and delinquency adjudications, R.C. 2929.04(B)(5),

- if the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of

the offender's participation in the acts that led to the death of the victim, R.C. 2929.04(B)(6),

• and any other factors that are relevant to the issue whether the offender should be sentenced to death, R.C. 2929.04(B)(7).

### 1. Age

{¶ 133} Under R.C. 2929.04(B)(4), "[t]he youth of the offender" is a mitigating factor. Lawson was born in 1994 and was 23 years old when he committed these murders. Lawson's age "qualifies as a mitigating factor under R.C. 2929.04(B)(4)." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 195.

{¶ 134} In the penalty phase, Lawson presented testimony from Dr. Stinson, a forensic psychologist. Dr. Stinson testified that the human brain continues to develop until a person reaches his mid-20s. He specifically noted that the frontal lobe—which is responsible for things like judgment, reasoning, impulse control, and planning—is the last part of the brain to develop and does not reach full development until the mid-20s.

### 2. Prior Criminal History

{¶ 135} Under R.C. 2929.04(B)(5), "[t]he offender's lack of a significant history of prior criminal convictions and delinquency adjudications" is a mitigating factor. The trial court found that Lawson has no previous convictions or delinquency adjudications.

### 3. Mental Disease or Defect

{¶ 136} The diminished-capacity mitigating factor, R.C. 2929.04(B)(3), is inapplicable. Although Lawson has been diagnosed with various mental disorders, including bipolar disorder, Dr. Stinson did not testify that any of them deprived him of "substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law," R.C. 2929.04(B)(3). The other

mitigating factors set forth in R.C. 2929.04(B) that are not addressed in this opinion are likewise inapplicable.

### 4. History, Character, and Background

{¶ 137} Lawson's history, character, and background constituted the heart of his case in mitigation. In the penalty phase, Lawson presented three witnesses: Carolyn Taylor, Stephanie Bentley, and Dr. Stinson. Carolyn Taylor is Lawson's mother. Stephanie Bentley is his half-sister and Carolyn's daughter. Dr. Stinson interviewed Lawson for a total of 12 hours during four sessions and also interviewed Lawson's mother. He reviewed information obtained by a mitigation specialist who had conducted interviews of Lawson, his mother, his stepmother Martha Lawson, his half-sisters Stephanie Bentley and Summer Riesner, and others familiar with Lawson and his family. Dr. Stinson reviewed children's services, educational, employment, medical, mental-health, and jail records pertaining to Lawson, records pertaining to Carolyn Taylor's family background and upbringing, and other records.

{¶ 138} Dr. Stinson identified 11 "adverse childhood experiences" ("ACEs") that place a child at risk for adverse health, mental-health, and social outcomes. They are physical abuse, sexual abuse, emotional abuse, physical neglect, emotional neglect, "intimate partner violence," violence against the mother, "substance misuse in the household," parental divorce or separation, mental illness of a household member, and the incarceration of a household member. Dr. Stinson testified that a research study conducted by the Centers for Disease Control and Prevention found that ACEs relate to approximately 40 negative outcomes. The presence of four or five ACEs indicates "significantly increased risk for negative outcomes," and the likelihood of negative outcomes rises with the number of ACEs.

{¶ 139} According to Dr. Stinson, Lawson had experienced "at least" nine ACEs. The only two Dr. Stinson failed to definitively find were sexual abuse and physical neglect.

{¶ 140} Lawson was born in April 1994. His parents are Delbert "Ray" Lawson and Carolyn Taylor. He was the third of five children Carolyn had by five different men. Both of Lawson's parents have been divorced and remarried multiple times. Carolyn has lived on welfare, food stamps, and Social Security disability benefits.

{¶ 141} Ray and Carolyn lived together for about a month; when Carolyn became pregnant with Lawson, Ray left her. Carolyn lost custody of Lawson in 1995. Ray denied his paternity until a DNA test proved that he was Lawson's father; after that, he sought and was awarded custody of Lawson. According to Dr. Stinson, Martha Lawson recalled that Carolyn had dropped Lawson off at Ray and Martha's house coatless in the middle of a winter night with the words, "It's your turn."

{¶ 142} Lawson lived with Ray and Martha until he was 16. Also living in the Lawson household were Ray and Martha's son Ray Jr. and Martha's son James Munyon. Carolyn was entitled to visitation with Lawson on Wednesdays and alternate weekends. However, she testified that sometimes Ray and Martha deprived Lawson of a visit as a punishment.

{¶ 143} While living with Ray and Martha, Lawson was especially close to his paternal aunt, Linda McFann. Carolyn testified that Linda was "like a second mom" to him. Unfortunately, Linda died in a house fire. Carolyn testified that Lawson was "devastated" by Linda's death. Dr. Stinson testified that Linda died in 2006, when Lawson was about 12 years old. According to Dr. Stinson, Lawson still had not "resolved" his bereavement five years later. At that time, a neighbor told Lawson that he was glad Linda was dead, and Lawson responded by

threatening the neighbor with a butcher knife. Lawson was hospitalized at a mental-health facility after this incident.

{¶ 144} Lawson was also quite close to the boyfriend of one of his aunts, whom he called "Uncle Tracy." Lawson told Dr. Stinson that Tracy was the most positive influence in his life. But Tracy died of a heroin overdose in about 2016.

{¶ 145} When Lawson was 16, Ray and Martha divorced, and Ray moved to Kentucky, leaving his children behind. Custody of Lawson then reverted to Carolyn, who had married Carl Kelly. A few months later, Carolyn and Kelly broke up, but Lawson continued to live with Kelly, whom Bentley described as like a father to Lawson. Dr. Stinson believed that Kelly was generally a positive influence on Lawson and may have provided "some positive role modeling." On the other hand, Bentley testified that Kelly sold a lot of marijuana and provided some of it to Lawson. After moving out, Carolyn maintained contact with Lawson, seeing him every few days and talking to him on the phone.

{¶ 146} Dr. Stinson described the "complicated family structure" within which Lawson was raised. Ray left Lawson's mother to marry Martha, and Lawson's mother had a relationship with Martha's brother Gary Munyon, who was the father of Lawson's half-sister Stephanie Bentley. Lawson was teased in school because of this "weird" family situation. Additionally, Lawson's grandfather fathered a child with one of his daughters-in-law (Lawson's aunt by marriage); that child was referred to as Lawson's "Uncle Cuz" because he was both uncle and cousin to Lawson.

{¶ 147} Since at least age 11, Lawson has repeatedly alleged that his father, stepmother, and other family members abused him. He described his father as an "abusive asshole" who would get drunk and punch him.

{¶ 148} Carolyn testified that during visitations, she sometimes saw unexplained injuries on Lawson. Once she saw stitches in his head. She said that someone once squeezed Lawson's ears so tightly that they were severely bruised

and had turned black. Bentley remembered seeing this as well, but she never saw any other bruising or injures. Lawson told Dr. Stinson that Martha would pinch his ears to the point of bruising and would strike him in the face.

{¶ 149} On one occasion, Carolyn testified, a dark orange substance was draining from Lawson's ear. Carolyn recalled that when she took Lawson to a doctor to treat his ear, the doctor said that it looked as if someone had jabbed the metal end of a pencil into Lawson's ear after removing the eraser.

{¶ 150} Dr. Stinson testified that according to the medical records he reviewed, there were two cases of drainage from Lawson's ears. The first instance of "bloody drainage" occurred when Lawson was three; almost a year later, Lawson experienced the orange discharge that had been described by Carolyn from the same ear. According to Dr. Stinson, medical records documented that Lawson's stepbrother, James Munyon, had shoved pencils into Lawson's ears; however, Dr. Stinson did not make clear whether this behavior had caused the discharges.

{¶ 151} Dr. Stinson admitted that to his knowledge, no specific instances of abuse against Lawson had ever been substantiated. And although Dr. Stinson believed that Lawson was a victim of abuse, he eventually conceded that he did not know whether Lawson had been abused. (Dr. Stinson did not classify the alleged insertion of pencils into Lawson's ears as a type of "abuse.")

{¶ 152} Dr. Stinson also testified that Lawson reported abuse "over and over and over to people who did nothing." Dr. Stinson felt that the fact that Lawson's claims went unheeded was actually "more relevant" than whether he actually was abused, because it contributed to his feelings of being unloved:

> We can look back on it and say "Well, it * * * really wasn't abuse."
> From my standpoint what's more relevant is the fact that once he
> reported his abuse, nobody did anything about it * * * and he

internalized [the belief that] nobody cares, nobody's going to protect
me, nobody loves me and I'm unlovable.

**{¶ 153}** Lawson did tell his mother that he was being abused, and his medical records showed that he reported past abuse to medical-health professionals during his treatment sessions.

**{¶ 154}** However, when Lawson first alleged to authorities that he was being abused, the authorities did not ignore it; they investigated and found no evidence to support the claim. The penalty-phase evidence includes records for Lawson and his family from the Lawrence County Department of Job and Family Services that were admitted as a court's exhibit. Those records include a children's services report showing that Ray and Martha were investigated in 2006 after Lawson reported to the Ironton police that he was being abused.

**{¶ 155}** According to the records, Lawson alleged that his stepmother slapped his face, his siblings "put erasers in his ears," and his parents "hit him everywhere." But the investigator found only one small bruise on Lawson's knee, and that appeared to the investigator to be normal for a preteen child and to not have been deliberately inflicted.

**{¶ 156}** The investigator learned that Lawson's father had recently spanked him with a belt; however, the spanking was inflicted as a punishment after Lawson choked his brother, Ray Jr., during a squabble. Martha told the investigator that Lawson had expressed a desire "to get his father in trouble like he was in trouble from choking" his brother.

**{¶ 157}** Although Lawson has never reported that he was sexually abused and in fact has denied it, Dr. Stinson nonetheless suspected that Lawson may have been sexually abused as a child. He based this suspicion on the existence of "rampant" sexual abuse in Lawson's family over the years. Carolyn's oldest son was allegedly sexually abused and went on to abuse two sisters and a cousin.

Lawson's stepbrother was sexually abused by a neighbor. One of Lawson's half-sisters was sexually abused by Carolyn's brother-in-law. A generation before, Carolyn's family members had been involved in numerous allegations of sexual abuse. Dr. Stinson believed that Lawson may have denied being sexually abused because it was so common as to become "normalized" in his family.

{¶ 158} Lawson's mother, Carolyn Taylor, was raised in poverty; her family was dependent on welfare and food stamps, and the children were malnourished. Carolyn grew up in a trailer that housed 12 people. Dr. Stinson testified that "there were concerns that the boys and the girls were sharing bedrooms and sleeping together." The home was leaky and roach-infested and had no indoor bathroom.

{¶ 159} During Carolyn's childhood, numerous allegations of physical abuse, sexual abuse, and neglect were leveled against her parents and stepparents; many of them were against her father in particular. Children's services investigators were able to substantiate some of these allegations, but according to Dr. Stinson, the "vast majority" were unsubstantiated. Nevertheless, Dr. Stinson testified that the "remarkable" number of allegations said a great deal about the culture of Carolyn's family.

{¶ 160} Dr. Stinson also stated that Carolyn suffered from "significant mental health problems." Documented symptoms he listed included agitation, anhedonia (loss of interest in pleasurable activities), anxiety, crying spells, disorganized thought, difficulty concentrating, hallucinations, homicidal and suicidal thoughts, hyperactivity, paranoia, panic attacks, phobic avoidance, preoccupation, self-mutilation, and feelings of worthlessness. Her "mood disturbance" manifested itself in the forms of severe depression, anger, euphoria, irritability, mania, and "mixed moods," i.e., simultaneous symptoms of depression and mania.

{¶ 161} Dr. Stinson related that Carolyn had been diagnosed with anxiety disorder, panic disorder, agoraphobia, "moderate and recurrent" major depressive disorder, various forms of bipolar disorder including "mixed [simultaneously manic and depressive] severe, with psychotic features," and schizoaffective disorder, a psychotic disorder combining schizophrenia and bipolar disorder. She had been treated with antidepressants, mood stabilizers, and antipsychotic drugs. Carolyn's doctor had determined that her mental disorders left her "functionally impaired," unable to carry on day-to-day activities. The Social Security Administration had found that she was "permanently impaired and unable to engage in any gainful activity."

{¶ 162} According to Dr. Stinson, Lawson also had three relatives—an uncle, aunt, and great-uncle—who had attempted suicide. And Lawson described a maternal half-brother as "absolutely insane" and as having delusions. Dr. Stinson testified that severe mental-health problems have a genetic component, so that the children of parents with severe mental-health problems are particularly at risk to inherit them.

{¶ 163} Lawson has in fact had mental-health problems and has been diagnosed with mental disorders since childhood. Most significantly, in March 2011, shortly before he turned 17, Lawson was diagnosed with anxiety disorder and bipolar disorder. In April of that year, he was admitted to the psychiatric ward at Mercy Franciscan Hospital after a violent incident with his neighbor. Hospital staff members believed that past abuse had contributed to his emotional difficulties.

{¶ 164} Lawson continued to receive mental-health evaluations and treatment in 2011 and 2012. During one psychiatric examination, he said he was having flashbacks to past abuse. In 2012, Lawson was hospitalized again because he was contemplating injuring his neighbor.

{¶ 165} Since 2011, Lawson has been diagnosed repeatedly with depressive disorder and PTSD. Dr. Stinson testified that when he interviewed Lawson, he

exhibited classic symptoms of depression and PTSD. Despite previous hospitalizations, Dr. Stinson testified, Lawson did not receive the kind of treatment he needed.

{¶ 166} Lawson has had anger issues dating back to his childhood. During the 2006 children's services investigation, the investigating social worker wrote that she was concerned about Lawson's inability to control his anger. Dr. Stinson testified that Lawson was enrolled in an anger-management class at age 13 because he was unable to regulate his emotions; however, his stepmother removed him because the class took time away from his chores and homework. At age 16, he was diagnosed with "anger disorder." Dr. Stinson noted that "there is no such thing as anger disorder," but he interpreted this diagnosis to mean that Lawson had a mood disorder in which anger was predominant.

{¶ 167} A consistent factor in Lawson's personality has been his repeatedly expressed feelings that he was worthless; he described himself to Dr. Stinson as feeling like "just a piece of crap" and "like a dog." Schoolmates made fun of his family and his first name. (His mother meant to name him "Aaron," but she misspelled it as "Arron" on his birth certificate. His preferred pronunciation is "Ar-*ron*," with the emphasis on the second syllable, but people frequently mispronounce it.) Bentley testified that Martha favored her own children over Lawson. According to Dr. Stinson, Lawson used marijuana to deal with feelings of emptiness and worthlessness.

{¶ 168} Lawson's family has an extensive history of drug and alcohol problems. Lawson told Dr. Stinson that his father, Ray, was "drunk all the time." Bentley testified that Ray drank "[e]very day, all day long." Carolyn told Dr. Stinson that Ray was "a real bad drunk." During the period when Lawson lived with Ray and Martha, Martha's brother Gary Munyon was released from prison and moved into the household. Dr. Stinson testified that Munyon not only smoked marijuana but traded it for sex.

{¶ 169} Despite Lawson's family history, Dr. Stinson believed that Lawson himself did not have "severe drug and alcohol problems." But Dr. Stinson stated that Lawson did use marijuana and other drugs to cope with physical pain and emotional distress. Bentley testified that Lawson smoked marijuana frequently or daily. Dr. Stinson diagnosed Lawson with a "cannabis use disorder," but he conceded that this disorder caused no major impairment of Lawson's functioning. There was no evidence that Lawson had been using alcohol or drugs at the time of the aggravated murders in this case.

{¶ 170} Lawson had numerous medical problems throughout his life. When he was two, a dog bit him on the cheek, although Carolyn testified that the injury was not serious. At the age of three, he had a laceration to the forehead, requiring stitches, and had skin-cancer surgery. At the age of four, his tongue was clipped twice to correct a speech impediment. Both the skin-cancer surgery and the tongue clipping were outpatient procedures. At the age of 12, while playing with his siblings, he was shot in one eye with an "airsoft" gun (similar to a BB gun, but firing plastic or rubber pellets), causing temporary blindness in that eye. Dr. Stinson testified that Lawson has continued to have "vision problems" since that injury. In addition, Lawson's gallbladder was removed in 2010.

{¶ 171} In 2011, Lawson suffered multiple medical problems. Severe headaches required several doctor and hospital visits. He also experienced degenerative disc disease, abdominal pain, and "abnormal findings related to his colon and appendix." In 2017, Lawson was in a "fender-bender" accident and struck his head on a rear-view mirror. While he did not seek medical attention at the time, he experienced chronic headaches after the accident.

{¶ 172} In addition to the above factors, Lawson expressed remorse for the murders in his confession and in his unsworn statement. He told the panel, "I know what I did was wrong" and stated that he was "truly sorry" for what he did. He apologized to everyone he had harmed, including the four murder victims and his

own family. He said that he cannot sleep at night, cries all the time, cries himself to sleep, and has flashbacks. He concluded: "I don't expect sympathy. * * * If it be death penalty, then I'll take it. I'm at peace with whatever you give me." Lawson also expressed his remorse to Dr. Stinson, who felt that Lawson's remorse was sincere.

{¶ 173} Dr. Stinson testified about Lawson's conduct in the Morrow County jail, where he was held pending trial. A jail supervisor described Lawson to Dr. Stinson as trustworthy, well behaved, respectful, and "not * * * a problem." Other correctional officers consistently told Dr. Stinson that Lawson was not causing any problems. Whenever Dr. Stinson saw Lawson interacting with officers, they seemed to have a tension-free and professional relationship. On one occasion, Lawson gave jail staff members advance warning that several other inmates were planning to disrupt jail operations by flooding their toilets.

{¶ 174} Lawson's jail records showed two "write-ups" in the approximately 16 months he was there. In January 2018, he got upset about a lockdown, kicked a door, and threatened an officer; he lost all privileges as a result. Dr. Stinson described the other incident as "equivocal." A Lawrence County deputy sheriff who was transporting Lawson accused him of resisting him and of disrespect and disobedience; however, a Morrow County deputy stated that there had been no problem. Lawson was not disciplined for this incident. Overall, Dr. Stinson opined that when compared to other inmates he had worked with, Lawson had adjusted to incarceration "relatively" well, even "remarkably well."

### 5. Nature and Circumstances of the Offense

{¶ 175} The trial court gleaned one mitigating factor from the circumstances of the offense: while in the Holstons' house on the day of the murders, Lawson fed two-year-old B.H., changed his diaper, and put him down for a nap. Beyond that, nothing about the nature and circumstances of the offenses in this case could be considered mitigating.

## C. Weighing

{¶ 176} We must determine whether the aggravating circumstances that were found by the three-judge panel outweigh the mitigating factors presented in this case beyond a reasonable doubt. R.C. 2929.05(A) and 2929.03(D)(1); *see State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 140. We determine that they do.

{¶ 177} Lawson's mental-health history is the strongest mitigating factor in this case. At various times, Lawson was diagnosed with bipolar disorder, depression, and PTSD, and he did not receive adequate treatment for these disorders. *See State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 209. We note in particular that bipolar disorder is "a major mental illness." *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 205. Although Dr. Stinson did not testify that the murders were attributable to Lawson's mental disorders, we find that Lawson's mental-health history is entitled to substantial weight.

{¶ 178} We must consider Lawson's youth as a mitigating factor. *See* R.C. 2929.04(B)(4). This court has frequently upheld death sentences for 23-year-old murderers and has ordinarily given the (B)(4) factor little weight in those cases. *See, e.g.*, *Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 195 ("little weight"); *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 173 ("modest weight"); *State v. Ferguson*, 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 127 ("little weight"). We recognize that we recently accorded "significant weight" to the age of an offender in *Graham*, *id.* at ¶ 207. However, *Graham* is fundamentally distinguishable. Graham had just turned 19 at the time he committed aggravated murder, a little more than one year removed from the minimum age for death-penalty eligibility. In contrast, Lawson was 23 when he committed the murders at issue here, a more significant passage of time from

the minimum age of eligibility. Therefore, we consider Lawson's youth to be a factor that carries some weight.

{¶ 179} The evidence that Lawson was abused is not conclusive. The record does show, however, that Lawson experienced a degree of instability in his upbringing, with several changes in custody and living arrangements. The evidence also shows that he was surrounded by poor role models and had few good role models and that he felt unloved and worthless.

{¶ 180} Because Lawson was 23 years old when he committed the four aggravated murders in this case, he had at least some "time to distance himself from his childhood and allow other factors to assert themselves in his personality and his behavior," *State v. Campbell*, 95 Ohio St.3d 48, 53, 765 N.E.2d 334 (2002); *compare Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, at ¶ 138 (19-year-old offender was "not far removed" from his upbringing).

{¶ 181} Yet we have "seldom ascribed much weight in mitigation to a defendant's unstable or troubled childhood." *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 174, citing *Campbell* at 51-54; *see also State v. Cooey*, 46 Ohio St.3d 20, 41, 544 N.E.2d 895 (1989). And Lawson's childhood surely presents nothing comparable to *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, which we have noted as "[t]he benchmark case for assessing the weight of childhood trauma" based on its "appalling facts," *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 248. The defendant in *Tenace* was raised by criminal and drug-addicted parents, sold by his mother for sexual services, forced to watch his sister being sexually abused, and encouraged to cheat and steal. *Tenace* at ¶ 102-103. Therefore, Lawson's history and background are entitled to some weight, "but only to the extent his 'criminal * * * acts are attributable to' it," *Campbell* at 53, quoting *California v. Brown*, 479 U.S. 538, 545, 2017 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring).

{¶ 182} Although retrospective remorse is ordinarily not a strong mitigating factor, "remorse [that] leads to surrender and confession is a more impressive factor." *State v. Wiles*, 59 Ohio St.3d 71, 93, 571 N.E.2d 97 (1991). In this case, Lawson did surrender—although that decision may have been influenced by a cold night in the woods without supplies, shelter, or weapons. More importantly, Lawson gave a complete, truthful confession that aided the police with their crime-scene investigation. Therefore, we find that Lawson's remorse and cooperation are entitled to some weight in mitigation. His generally good conduct in jail is also entitled to some weight.

{¶ 183} With respect to D.H.'s murder, the aggravating circumstances include that Lawson engaged in a course of conduct—i.e., committed multiple murders—and the fact that D.H. was younger than 13. "In particular, the R.C. 2929.04(A)(9) child-murder specification is entitled to great weight because it involves the murder of a young and vulnerable victim." *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 328. And the cold-blooded nature and details of D.H.'s murder are especially significant concerns. Moreover, the commission of multiple murders is a grave aggravating circumstance that carries great weight. *State v. Hutton*, 100 Ohio St.3d 176, 2003-Ohio-5607, 797 N.E.2d 948, ¶ 91. The two felony-murder circumstances and the escaping-detection circumstance add still more weight to the state's side of the scales.

{¶ 184} The murders of Stacey and her parents lack the child-murder aggravating circumstance, but each has a course-of-conduct and a felony-murder circumstance. In addition, the murders of Stacey's parents have the escaping-detection circumstance.

{¶ 185} Two recent cases in which we have found that aggravation did not outweigh mitigation beyond a reasonable doubt, *Johnson* and *Graham*, each involved 19-year-old defendants, both of whom "entered a residence to commit robbery and killed a [single] person inside." *Graham*, 164 Ohio St.3d 187, 2020-

Ohio-6700, 172 N.E.3d 841, at ¶ 215. By contrast, Lawson was 23 years old; he entered the Holstons' residence and lay in wait specifically to kill; over a period of 12 hours, he killed four people, one an eight-year-old child who should not even have been in the house, and he attempted to kill a fifth.

{¶ 186} This case invites particular comparison with *Graham*, which it resembles in that both Lawson and Graham were young defendants who suffered from untreated or insufficiently treated mental-health issues and adverse environmental factors. *See Graham* at ¶ 196. In fact, Lawson's mental disorders— bipolar disorder, PTSD, depression, and anxiety—are more significant than Graham's oppositional defiant disorder and conduct disorder, *see id*.

{¶ 187} However, this case is distinguishable from *Graham* in numerous important ways. We have already noted some of the key distinctions: Lawson was four years older than Graham was when the crimes were committed; Lawson killed four people to Graham's one; one of Lawson's victims was eight years old and that innocent victim was in the house only because of Lawson's deception; Lawson entered the house where the crimes occurred with the express purpose of committing murder, unlike Graham, who entered for the purpose of robbery with no intention to kill anyone. And the list goes on.

{¶ 188} While Graham was the principal offender in the aggravated murder he committed, he "was not the mastermind," 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, at ¶ 205, of the drug robbery that led to the murder; he was recruited by a friend. In this case, Lawson was not just the principal offender; he was the *sole* offender. Nobody recruited or enticed him; the whole thing was his idea.

{¶ 189} The murder in *Graham* was a quick reaction to events during the robbery: Graham told the victim not to look at the robbers, the victim expressed doubt that Graham would shoot him, and Graham shot him. *Id*. at ¶ 12. In contrast,

Lawson planned and prepared for Stacey's murder well in advance and committed four murders over a 12-hour period in which the death toll mounted.

{¶ 190} Like Lawson, Graham used marijuana daily. But unlike Lawson, Graham was also addicted to Xanax, using "massive" daily amounts of it, *Graham* at ¶ 199. Moreover, Graham's Xanax use made him more irritable and aggressive and less inhibited. *Id*. at ¶ 199, 210. Indeed, Graham's expert witness testified that it was unlikely that Graham would have committed the murder but for his Xanax addiction. *Id*. at ¶ 199. Lawson had a cannabis-use disorder, but according to Dr. Stinson it caused no major impairment of his functioning, and there is no evidence that drug use played any role in the murders in this case.

{¶ 191} This case is undeniably one in which the defendant has presented significant mitigating factors. But this is also a case in which the defendant slaughtered four people, including the callous slaying of an eight-year-old child. With respect to each of the four aggravated murders before us, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

## D. Proportionality

{¶ 192} We further determine that the death sentences for these crimes are proportionate to sentences approved in similar cases. We have approved death sentences in cases combining multiple murders with one or more child murders. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051; *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865; *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242; *Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180. Indeed, we have approved death sentences in numerous cases that involved multiple murders when all the victims were adults. *See*, *e.g*., *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554 (two murders, one attempted murder); *Beasley*, 153 Ohio St.3d 497, 2018-Ohio-

493, 108 N.E.3d 1028 (three murders, one attempted murder); *State v. Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867 (three murders).

## VIII. CONCLUSION

{¶ 193} We affirm the judgments of conviction. We further affirm all four sentences of death.

Judgment affirmed.

FISCHER and DEWINE, JJ., concur.

DONNELLY, J., concurs, with an opinion.

O'CONNOR, C.J., concurs in judgment only and concurs in Justice Donnelly's concurring opinion.

STEWART, J., concurs in part and dissents in part and would reverse the death sentences.

BRUNNER, J., dissents, with an opinion.

_____

**DONNELLY, J., concurring.**

{¶ 194} Respectfully, I fully concur with this court's judgment affirming appellant Arron L. Lawson's convictions. I reluctantly concur, however, with this court's judgment affirming Lawson's death sentence.

{¶ 195} Having been diagnosed with bipolar disorder, posttraumatic-stress disorder, and depression, there is no denying that Lawson suffers from serious mental illnesses and that he did not receive adequate treatment for these disorders. Of these diagnoses, bipolar disorder has been found to be a major mental illness. *See State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 172, 205. The majority opinion recognizes that Lawson's mental-health history was substantial and accorded it the mitigating factor entitled to the strongest weight. *See* majority opinion at ¶ 177. The General Assembly has also recognized the critical importance of this issue, *see* 2020 Am.Sub.H.B. No. 136, which became effective during the pendency of this appeal.

{¶ 196} As of April 12, 2021, a person who has been diagnosed with a "serious mental illness"—including bipolar disorder—is ineligible for a death sentence, R.C. 2929.025(E)(1), when the defendant timely raises the issue and proves by a preponderance of the evidence, R.C. 2929.025(D)(1), that the illness "significantly impaired the person's capacity to exercise rational judgment," 2929.025(A)(1)(b), with respect to either conforming to the law or appreciating the nature, consequences, or wrongfulness of the person's conduct, 2929.025(A)(1)(b)(i) and (ii). Because Lawson was sentenced before the effective date of 2020 Am.Sub.H.B. No. 136, he has one year after its effective date to seek a postconviction remedy, R.C. 2953.21(A)(2)(b). *See also* R.C. 2953.21(A)(1)(a)(iv) and 2953.21(A)(3)(a), as amended. Notwithstanding our judgment today, the postconviction statutes leave a door open for Lawson.

O'CONNOR, C.J., concurs in the foregoing opinion.

_____

**BRUNNER, J., dissenting.**

{¶ 197} Testing the competency of persons accused of capital crimes is critical to affording the degree of due process guaranteed by the Ohio and federal Constitutions and fulfills the proscription found in the Eighth Amendment to the United States Constitution against cruel and unusual punishment. *Drope v. Missouri*, 420 U.S. 162, 174-175, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In short, ensuring that a defendant is competent to stand trial is necessary to protect the right to a fair trial. *Drope* at 174-175.

{¶ 198} However, determining competency and the mental condition of an accused is not just an exercise that is relevant to trial participation. Competency must also be established to convict, *see Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), and execute, *see Ford v. Wainwright*, 477 U.S. 399, 410, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) an accused. The United States

Supreme Court has also prohibited the execution of severely mentally impaired defendants, finding the execution of those defendants excessive and violative of a number of public policies concerning capital punishment. *Atkins* at 321. The United States Supreme Court has also prohibited the execution of juveniles, recognizing their developmental immaturity and diminished culpability. *Roper v. Simmons*, 543 U.S. 551, 569-571, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). In Ohio, the General Assembly has recently prohibited the imposition of the death penalty for the crime of aggravated murder when the defendant had a serious mental illness at the time that he committed the offense. *See, e.g.*, R.C. 2929.02(A), 2929.025, and other statutes enacted in 2020 Am.Sub.H.B. No. 136. This case is therefore about more than whether appellant, Arron Lawson, was able to consult with his lawyers and reasonably understand the proceedings against him. This appeal is an opportunity for this court to reexamine the protections and precautions that are central to ensuring that any death sentence that is imposed is appropriate and subjected to a reliable, deliberate, and rigorous constitutional review.

{¶ 199} Former Justice Paul Pfeifer stated when he served as a justice of this court that "[t]he death penalty should be reserved for the most severe of cases." *State v. Ashworth*, 85 Ohio St.3d 56, 75, 706 N.E.2d 1231 (1999) (Pfeifer, J., dissenting); *see also State v. Murphy*, 91 Ohio St.3d 516, 563, 747 N.E.2d 765 (2001) (Pfeifer, J., dissenting) (the death penalty should be imposed only on "those murderers who truly deserve death"). It is difficult to imagine Lawson's horrendous acts not falling into the category of the worst of cases. But this court is constitutionally bound to not only review Lawson's sentence but also to verify the integrity of the process leading to the imposition of the death penalty as the punishment for his crimes. This should not be a mechanistic analysis; it should be a thorough endeavor that closely examines all aspects of the proceedings that have culminated in our review. Because there are too many unaddressed concerns in the majority's analysis, I respectfully dissent.

**I. Lawson's Competency to Enter Guilty Pleas and Waive a Jury Trial**

*A. A trial court's duty regarding a defendant's competency*

{¶ 200} When the issue of competency is "raised" before trial by counsel for a criminal defendant, by the prosecution, or by the court, a hearing on the matter is mandatory. R.C. 2945.37(B); *State v. Bock*, 28 Ohio St.3d 108, 109, 502 N.E.2d 1016 (1986). Likewise, after the conclusion of the trial-court proceedings, if a person who was convicted of a capital crime and sentenced to death wanted to forgo further legal challenges, essentially volunteering for death, this court has required that the person undergo a competency evaluation and that the trial court hold a hearing before such a request would be honored. *See State v. Berry*, 74 Ohio St.3d 1492, 658 N.E.2d 1062 (1996) (ordering that an independent psychiatric expert be appointed); *State v. Berry*, 77 Ohio St.3d 1439, 671 N.E.2d 1279 (1996) (remanding the matter to the trial court for an evidentiary hearing on mental competency). For the period of litigation lying between the two markers of a death-penalty proceeding—i.e., before the trial and during or following the sentencing (such as forgoing an appeal or forgoing other legal challenges)—there are points at which a defendant's decision or request may or is likely to be an indicator that his competency to assist in his own defense should be determined pursuant to R.C. 2945.37(G), such as when a defendant indicates his or her wish to terminate counsel's representation, when a defendant indicates his or her wish to waive a jury trial, and when a defendant indicates his or her wish to forgo the presentation of all or some mitigating evidence at sentencing. These pivotal points along the continuum of a death-penalty prosecution are critical events that could serve in whole or in part to tip the scales of justice toward or away from the ultimate punishment—death.

{¶ 201} Therefore, it is understood that R.C. 2945.37(B) dictates that when requested before trial, a competency examination is mandatory and that when a defendant wishes to waive the ability to challenge an imposed death sentence, a

competency hearing is required, *see State v. Berry*, 80 Ohio St.3d 371, 375, 686 N.E.2d 1097 (1997). However, clear guidelines are lacking about the way competency should be questioned and examined in the stages that occur between the period before the start of a trial and the final imposition of a death sentence. Thus, trial courts have been free to apply whatever standards they choose during those stages, and their decisions are not overturned on appeal unless there are "sufficient indicia of incompetency" in the record, *State v. Were*, 94 Ohio St.3d 173, 761 N.E.2d 591 (2002), paragraph two of the syllabus. This court has stated that " '[c]ommon sense dictates that no defendant can make a record of lack of competency absent the findings and hearings contemplated by R.C. 2945.37 and 2945.371.' " *Were* at 177, quoting *Bock* at 113 (Wright, J., dissenting). Thus, relying on a record when there is no requirement to create one is hardly the model of fair process, and it cannot in any sense be deemed rigorously constitutional.

### B. Indicia of incompetency in Lawson's case

{¶ 202} Lawson has raised three areas of concern that, taken together, should be held to have triggered the trial court's duty to order a pretrial incompetency exam: when Lawson acted against the advice of his counsel by waiving a trial and entering guilty pleas, when Lawson exhibited indecisiveness about his decision to enter guilty pleas, and when Lawson revealed to the court that he was taking prescription medications. Going against the advice of counsel, alone, does not equate with incompetence. Indecisiveness, alone, may not necessarily constitute a clear indicator that a defendant is incompetent to stand trial. Nor may taking prescription medications, standing alone, be a clear indicator of incompetence. Our inquiry in this appeal, however, is not whether *we believe* that Lawson was competent; it is whether these factors taken together should be held to reasonably indicate to a trial court that further inquiry into the defendant's competency is required, to ensure the fairness of the proceeding, especially in a capital case. *See* R.C. 2945.37(B).

**{¶ 203}** There were indicia, i.e., signs or indications, that should have prompted—and did prompt—the trial court to further inquire about concerns of possible "mental defect or mental deficiency" regarding Lawson's competency to waive a trial and change his pleas. On multiple occasions, the trial court raised the issue of a possible competency evaluation.[1] The record *is* clear that the presiding trial judge was hesitating and "second-guessing" whether the types of considerations underlying *Atkins*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, and other precedents had been observed or applied. The trial judge appeared hesitant about Lawson's thought process in making the grave and weighty decision to plead guilty in a proceeding that could carry the consequential punishment of death.

**{¶ 204}** Lawson's actions in waiving his right to a jury trial and entering pleas of guilty to multiple capital offenses, combined with the trial court's hesitations, were indicia of incompetency that do exist in our limited record, considering that no competency examination or hearing ever occurred. It should not be our role to guess from the evidence what Lawson's state of mind was and therefore what his mental capabilities were. If he had been assessed for competency, we would be able to read a report from a mental-health professional about his ability and state of mind. Without that kind of evidence, it is difficult to discern from the record whether Lawson was exercising the rights of a rational, mentally and physically healthy person in making this decision. *See Berry*, 80 Ohio St.3d at 375, 686 N.E.2d 1097, quoting *Smith v. Armentrout*, 812 F.2d 1050, 1057 (8th Cir.1987) (it is " 'very probable' " that in " 'every case' " in which a capital

---

1. The majority opinion outlines the discussions between the trial judge and counsel regarding Lawson's competency, including an in-chambers discussion on February 11, 2019. During that discussion, the trial judge noted that he had "brought this [issue] up months ago" and was now "second-guessing" his decision to decline to order a competency evaluation. Further discussion in the record occurred on February 21, 2019, when the presiding trial judge asked counsel whether they had any concerns about Lawson's having any "mental defect or mental deficiency" and inquired as to counsel's investigation of those issues.

defendant desires to " 'abandon further legal proceedings, there will be a possibility that the decision is the product of a mental disease, disorder, or defect' "). That we would guess or infer what a competency evaluation *would have* shown debases our unique role in reviewing death-penalty appeals.

{¶ 205} The record is clear that when the trial court during the plea colloquy asked Lawson whether his mental clarity was affected by any medications, Lawson disclosed that he was taking several—naproxen, Vistaril, metronidazole, and Zoloft. The trial court questioned Lawson and defense counsel regarding these medications and asked whether they could be affecting Lawson's ability to reason or his judgment. And while there is no affirmative indication in the record that Lawson's medications did affect his ability to understand or reason, more inquiry certainly was in order. *See Drope*, 420 U.S. at 174-175, 95 S.Ct. 896, 43 L.Ed.2d 103 (discussing whether, in light of inferences drawn from the undisputed evidence, the trial court's failure to further inquire into a defendant's competency deprived him of a fair trial). Unanswered questions remained: Why was he taking those medications? How long had he been taking those medications? What medical diagnoses and symptoms indicated that those medications should be prescribed? Was he experiencing or had he ever experienced any side effects from those medications, including drowsiness, confusion, or suicidal thoughts? A competency exam could have provided answers to these questions to allay concerns regarding Lawson's competency. Lawson's statement that he was taking prescription medications was, at a minimum, a legitimate factor relating to the fundamental question of his competency to stand trial and to decide to plead guilty to capital murder.

{¶ 206} The majority, citing *State v. Cowans*, 87 Ohio St.3d 68, 84, 717 N.E.2d 298 (1999), reasons that the trial court and defense counsel were able to observe Lawson and that he exhibited no behavior that raised any question as to his competency. There are a number of reasons why licensed members of the legal

profession and the judiciary should not perform competency evaluations based on their own observations, either directly or indirectly by reading a record. Using this method to make what amounts to a medical determination that a person charged with a capital crime is or was competent is not only constitutionally flawed, it is unacceptable. This is particularly so when there is evidence that a defendant is taking prescription medications that may affect his or her behavior or demeanor.[2] No one asked Lawson whether drowsiness or confusion might be a side effect of any of his medications. No one asked Lawson whether any of his current medications were prescribed for impulse control. No one asked Lawson whether he was depressed or suicidal. And no one asked him on the record *why* he was choosing to plead guilty to capital offenses.

{¶ 207} Lawson's decision to waive a trial and enter pleas of guilty in this capital case, combined with the trial court's apparent misgivings as they appear in the record, support that further inquiry into Lawson's competency was necessary. I would thus reverse the trial court's judgment based on this issue and would remand this cause to the trial court for further proceedings regarding Lawson's competency.

*C. R.C. 2945.37(B) requires a hearing when the issue of competency is raised*

{¶ 208} The majority rejects Lawson's argument that R.C. 2945.37(B) required a competency hearing in this case, concluding that the issue was not sufficiently raised at trial and that, even if it had been, not raising it was harmless error. When "the issue of the defendant's competence" to stand trial is "raised" before the trial has begun, "the court *shall* hold a hearing on the issue." (Emphasis added.) R.C. 2945.37(B). The statute does not require the issue to be sufficiently

---

2. According to information available on the Cleveland Clinic's website, drowsiness is a side effect of most of the medications Lawson was taking; confusion is a side effect of Vistaril and metronidazole; and suicidal thoughts, loss of memory, hallucinations, and loss of contact with reality are side effects of Zoloft. https://my.clevelandclinic.org/health/drugs (accessed July 9, 2021) [https://perma.cc/UL5E-XLDS].

raised, raised by motion, or raised with the intention of obtaining or ordering a hearing. *See id.* ("the court, prosecutor, or defense may raise the issue").

{¶ 209} On multiple occasions before the trial began, the trial court itself raised the issue whether a competency evaluation should be done. *See* fn. 1 of this opinion, *supra*. The majority interprets the record to indicate that the trial-court judge was merely asking the defense whether it wanted a competency hearing. But isn't it just as plausible that the trial judge was truly questioning whether there was enough information available to reach a sound conclusion that Lawson was competent to not only stand trial but to waive it? At any rate, this was not a situation in which the trial judge specifically stated that Lawson " 'evidenced no mental instability,' " *Cowans*, 87 Ohio St.3d at 84, 717 N.E.2d 298. Rather, the court "raised" the issue of Lawson's competency for purposes of R.C. 2945.37(B).

{¶ 210} Nothing prohibits this court from reviewing the record and determining that the issue of competency was raised. Nothing prohibits us from remanding this case for a competency evaluation to be conducted and a competency hearing to be held; the result of that hearing would determine the course of events from that point. Such a hearing is required by statute, but one was not held. If we do this, we would accomplish several important aims. We would acknowledge the gravity of any capital defendant's adverse-interest request to plead guilty to a capital offense. We would also provide valuable guidance to this state's trial courts that creating a sound record compliant with R.C. 2945.37(B) is required, especially when the defendant is making an adverse-interest decision, such as waiving a trial and pleading guilty to one or more capital offenses. Remanding this case for a competency hearing would be of benefit to the public in ensuring a high standard of compliance with due-process principles in cases in which a death sentence could be imposed.

{¶ 211} The issue of Lawson's competency was raised, requiring the trial court to hold a competency hearing. *See Bock*, 28 Ohio St.3d at 109, 502 N.E.2d 1016; R.C. 2945.37(B). We should require that this hearing be held.

### D. General problems with the current framework

{¶ 212} When a capital defendant seeks to abandon his or her rights and acquiesce in entering a guilty plea, essentially clearing the thorny thicket on the path toward execution by the state, we owe that defendant, the victims and their families, the lower courts, and the public at large a standardized approach to ensure fairness and uniformity in trials of this gravamen. Viewing the record using the "sufficient indicia of incompetency" method falls short, because it is based on gleaning information from a record when often no record was made.

{¶ 213} It is not acceptable to simply rely on the observations of the trial court and/or the experiences and opinions of defense counsel that a criminal defendant is competent to stand trial. The dissenting opinion in *State v. Montgomery*, relying on *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 66, and *United States v. Damon*, 191 F.3d 561, 565 (4th Cir.1999), squarely addressed this point:

> The majority seems to be satisfied that [appellant, Caron Montgomery,] stated in open court that he understood what he was doing and that he signed a written waiver. This conclusion was bolstered by the opinion of Montgomery's attorney—who was not a medical expert—that Montgomery understood the rights that he was waiving. But if medication prevented Montgomery from truly comprehending his actions, how reliable were his spoken assurances and his signed statement to the contrary? The trial court did not inquire about whether or how the medications affected Montgomery's abilities.

> I believe that more was required under *Mink* and *Damon*. At the very least, when someone is undoubtedly under the influence of a prescription medication when making the decision to enter a guilty plea, the trial court must inquire about the effects of the medication so that it can ensure that the defendant understands the gravity of the situation and comprehends his or her actions. This court should not affirm a conviction, let alone a death sentence, by *guessing* about the mental competence of a defendant. Further inquiry was required before the trial court accepted Montgomery's plea of guilty.

(Emphasis sic.) *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 196-197 (O'Neill, J., dissenting). Most attorneys and judges are not practicing mental-health or disability experts. Relying on a defense attorney's opinion, when that opinion is likely to be a one-off (based on how defense counsel interprets the defendant's behavior at that particular juncture of the trial), anecdotally based opinion on the defendant's competency is neither a sound legal nor ethical practice. Judging a criminal defendant's capacity to reason and understand through *observed behavior by defense counsel and/or the court, especially when coupled with a grave, adverse-interest decision such as pleading guilty to one or more capital offenses*, denies due process when the defendant is taking prescription medication with clinical indications and side effects that research shows may affect sound reasoning at the time the defendant changes his or her plea. And, finally, there is an inherent and systemic flaw that may not even be recognized when we perpetuate reliance on judges' and attorneys' subjective assessments of a capital defendant's competency to stand trial or change a plea: perhaps we perpetuate predisposed ideas and stereotyped, culture- or race-based perceptions and predispositions about what is acceptable behavior during a trial. *See State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 62-

63 (giving deference to those who saw and heard the proceedings and stating that the defendant "displayed no outrageous, irrational behavior during trial"). We can do better than this. We are obligated to do better than this, especially in capital-murder trials, when the ultimate penalty is death at the hands of the state.

{¶ 214} In the last 35 years, this court has rarely determined that a competency examination or hearing was warranted based on indicia in the record.[3] In an opinion that might be considered an outlier, *Were*, 94 Ohio St.3d 173, 761 N.E.2d 591, we remanded a death-penalty case for the trial court to conduct a pretrial competency hearing. This result was based on defense counsel's repeated requests for a competency hearing; on one defense attorney's opinion, based on his prior experience as a probate-court referee in civil-commitment hearings, that the

---

3. In examining cases in which this court has considered the issue whether a competency examination or hearing should have been conducted when a defendant made a request adverse to his own interest, this court has overwhelmingly held that insufficient indicia of incompetency were present. *See, e.g.*, *Montgomery*, 148 Ohio St.3d 347, 2016-Ohio 5487, 71 N.E.2d 180, at ¶ 57-59 (insufficient indicia of incompetency when defendant answered questions appropriately at plea hearing, defense counsel's assessment of competency was informed, and defendant displayed no outrageous, irrational, or confused behavior); *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 157, 161 (insufficient indicia of incompetency when defendant wished to fire counsel and counsel requested competency hearing; trial court denied request after conducting "its own examination of Johnson"); *State v. Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 59-60 (insufficient indicia of incompetency when defendant wished to limit the presentation of mitigating evidence and had attempted suicide nine months before trial); *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 98-99 (trial counsel were not ineffective for failing to request a competency exam when defendant elected to limit the presentation of mitigating evidence, because there were insufficient indicia of incompetency in the record); *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 148-158 (insufficient indicia of incompetency when defendant's behavior in court did not suggest that he was incompetent and counsel did not request a competency exam, even though defendant was called "Crazy George" by other inmates and had previously exhibited paranoia); *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 65-68 (denial of request for competency hearing after trial had commenced was not abuse of discretion because there were insufficient indicia of incompetency, even though an expert testified that defendant suffered from severe mental illness); *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 29-31 (insufficient indicia of incompetency when defendant wished to waive counsel but no other behaviors raised concerns about his competence); *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 37-39 (insufficient indicia of incompetency due to lack of "[o]bjective indications such as medical reports, specific references by defense counsel to irrational behavior, or the defendant's demeanor").

defendant was incompetent; and on the defendant's delusional beliefs, documented in pro se filings, that his attorneys were in cahoots with the state. *Id.* at 175-176. We determined that this perfect storm of facts met the "sufficient indicia" test: a defense attorney who was adept at recognizing potential incompetency, a defendant whose behavior rose to such a level that his counsel believed that he was not able to understand the proceedings against him, and the existence in the record of numerous motions and requests for a competency assessment. *Id.* This court's decision today permits and perpetuates a practice that a clinical evaluation of the mental competence of a defendant in a death-penalty case is not needed when a defendant pleads guilty to the crime, even though there is ample evidence in the record of his mental illness. And we find today that no medical evaluation for competency is required when a defendant's experienced attorney—by self-proclamation—has adjudged his client to be competent based on counsel's stated ability to recognize mental illness, even when that client may not outwardly demonstrate visible symptoms of mental illness to nonclinical laypersons during the limited time they interact with them.

{¶ 215} In short, the approach perpetuated in this case denies criminal defendants accused of capital crimes the guarantee that the laws of this state will be applied in a rigorously constitutional manner when the consequences may be irrevocable. We should not continue to rely on indicia in the record as sufficient to determine a defendant's competence to plead guilty without requiring evidence based on sound medical judgment. It is incumbent on this court to require in death-penalty cases what is now readily at our disposal—the use of science in a competency evaluation so that the state puts to death only those whom we may fairly determine have knowingly and competently pleaded guilty. In doing this, we would avoid what amounts to guessing who is competent based on "indicia" (that may or may not make it into the record) in favor of science-based evidence that is informed by evidence-based practices.

*E. The need for evidence-based practices and not just indicia in the record*

{¶ 216} On February 21, 2019, when the trial court held a change-of-plea hearing for Lawson, the presiding judge asked defense counsel whether they had any concerns about Lawson's having any "mental defect or mental deficiency." Lead defense counsel first informed the court that he was not "a psychologist or a psychiatrist" and was not in a position to "technically answer" that question. Defense counsel then informed the trial court that Dr. Bob Stinson had been consulted on the issue and that the defense did not intend to raise the issue of Lawson's competency. At this point in the proceedings, there was nothing in the record about Lawson's being suicidal, having attempted suicide in the past, having experienced (or at the time experiencing) confusion and possible hallucinations, or taking several medications. The fact that those indicia were not yet in the record at this point does not negate their existence. It does, however, demonstrate the inherent flaws in this court's current "sufficient indicia of incompetency" test.

{¶ 217} Defense counsel, the prosecutors, and the trial court entertained the possibility of having Dr. Stinson render an opinion on Lawson's competency. Dr. Stinson had been hired as a mental- and behavioral-health expert for the mitigation phase of the trial. He was not hired to perform a competency examination for the purpose of trial. However, had the trial court been able to conduct at least a review of his written report at this juncture of the proceedings, the following would have become apparent:

1.  Lawson was raised in a dysfunctional family, suffered from poverty, emotional abuse, and probably physical abuse, and was exposed to familial incest;

2.  Lawson's family members had a history of mental illness, including bipolar disorder, depression, and suicidal behavior, and had a history of alcoholism and drug abuse; Lawson's mother was rated as being "significantly functionally impaired" by her physician;

3. Lawson had mental-health problems starting at least by age 13, when he was enrolled in anger-management classes; he was diagnosed with bipolar disorder in 2011; he was admitted into a psychiatric hospital on two occasions following suicidal and homicidal episodes; he has been diagnosed with depressive disorder and posttraumatic-stress disorder;

4. Since his psychiatric hospitalizations, he has been on a number of medications, including mood stabilizers, antidepressant medicines, antipsychotic drugs, and a medication to help with sleep and to control impulses;

5. After his arrest, Lawson was seen by staff members at Shawnee Mental Health, where he disclosed that he had attempted to hang himself several years before and reported that he had been having thoughts of suicide;

6. After his arrest, Lawson was diagnosed with depression and anxiety and reported to Dr. Stinson that he was having trouble sleeping and concentrating and was occasionally having auditory and visual hallucinations.

{¶ 218} This information about Lawson was not discussed at all at this point in the proceedings even though it is discussed in this court's majority opinion. The Arron Lawson identified and described in Dr. Stinson's report is a person impaired by mental illness who has a stated history of being suicidal. The trial court was not presented with this information until the mitigation phase of the proceeding, and this is precisely an example of the problem with the test this court adopted in the past and once again applies in Lawson's case. Had the trial court simply ordered a competency examination, as was discussed at several junctures during the trial phase, the issue of Lawson's competency to stand trial would have been made clear in the record beyond the mere presence of vague indicia that the record now contains.

{¶ 219} Putting someone to death for his or her crimes, even when the crimes are heinous and when it is apparent that the person on trial is the person who committed the crimes, is always subject to the constitutional due-process principles contained in the Bill of Rights, a document once demanded by, and its contents now guaranteed to, the people. Due-process principles are not satisfied by guessing or by the acknowledged inexactitude of gleaning indicia from a sketchy trial record. The determination of Lawson's competency should be based on evidence. That the question of his competency was "raised" was enough to require the trial court to order a competency evaluation and a hearing on the matter under R.C. 2945.37(B), no matter what his attorney said to the court. *See Drope*, 420 U.S. at 177, 95 S.Ct. 896, 43 L.Ed.2d 103 (finding that even when a question of competency is inartfully raised "it would have been, at the very least, the better practice to order an immediate examination").

{¶ 220} No longer should this court rely on the mere scaffolding of tradition, intuition, and prior case authority for determining a matter that is the subject of scientifically supportable evidence, especially when a statute (R.C. 2945.37(B)) requires otherwise. The benefits of requiring evidenced-based practices when determining a defendant's competency to stand trial are similar to the benefits that are detailed in clinical literature for programs involving everything from medicine and nursing, to education, to mental-health and substance-abuse services, to psychiatry, to the imposing of criminal-justice sanctions and more. *See, e.g.*, *Social Programs that Work*, http://www.evidencebasedprograms.org (accessed July 9, 2021) [https://perma.cc/T76K-9KFZ]. The United States government's Substance Abuse and Mental Health Services Administration maintains an Evidence-Based Practices Resource Center, which supports the administration's stated purpose of "improving prevention, treatment, and recovery support services for mental and substance use disorders," https://www.samhsa.gov/resource-search/ebp (accessed July 9, 2021)

[https://perma.cc/M24L-T4P4]. This governmental center "provides communities, clinicians, policy-makers and others with the information and tools to incorporate evidence-based practices into their communities or clinical settings." *Id.* The center's website contains a plethora of publications on both substance abuse and mental illness, including co-occurring disorders, for both youths and adults. This court should be requiring that evidence-based practices be the standard for competency evidence used by the courts of this state for what are essentially clinical conclusions regarding defendants' competency to stand trial. Once we do this, we will have taken a giant stride to ensure that due-process principles are adhered to in the prosecutions of persons accused of crimes, especially those accused of committing capital crimes.

*F. Questioning competency at the instance of an adverse-interest request*

{¶ 221} When reading the fact pattern of violence and often torture that occurs in nearly every death-penalty case, the reader is left to conjecture: *Who in their right mind could do such a thing?* Since that perception is present from the beginning, and since an adverse-interest request such as agreeing to plead guilty to a capital offense as charged could be viewed as irrational and against the defendant's self-interests, it would be best for courts to start from a presumption that competency is at issue whenever a defendant makes an adverse-interest request. Starting with this presumption and questioning competency in this way would mean that a trial court's compliance with R.C. 2945.37(B) would be ensured. The trial court would then be required to conduct further inquiry, thus creating a record and instilling a more reliable, constitutional approach.

{¶ 222} Questioning competency at the instance of an adverse-interest request alleviates the necessity for a court to inquire as to defense counsel's position on the subject. The judiciary must dismiss the temptation to put defense attorneys in the position of assessing their clients' capabilities, which goes beyond the attorneys' expertise and their ethical duties. We also should steer courts away from

looking for subjectively bizarre behavior and encourage them to simply obtain information from a clinical expert using evidence-based practices.

{¶ 223} Questioning competency at the instance of an adverse-interest request also triggers the building of a record. A competency examination and a hearing would be the most comprehensive way to ensure a complete and thorough record. The trial court should make a finding one way or the other based on evidence in the record regarding the defendant's mental capacity to understand choices and assist in his or her own defense. This includes determining whether the defendant possesses the ability to comprehend the ramifications of his or her decision, including understanding that the choice may lead to death, determining whether the defendant is able to make such a decision knowingly and intelligently, not unduly affected by conditions of mental health, physical health, or imprisonment, and determining whether the defendant possesses the ability to reason logically and fully understands the ramifications of his decision. *Berry*, 80 Ohio St.3d at 371, 374-376, 686 N.E.2d 1097.

{¶ 224} For example, in *State v. Mink*, in which the defendant was charged with aggravated murder for the horrendous stabbings and beatings of his parents, the trial court sua sponte appointed two psychologists to conduct separate competency examinations when Mink first informed the court that he wished to enter pleas of guilty to all counts, to waive the presentation of mitigating evidence, and to represent himself. 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, at ¶ 31, 59-60. The trial court then made an initial determination based on the reports of those psychologists that Mink was competent to stand trial and accepted his guilty pleas and later made a separate determination that Mink was competent to waive the presentation of mitigating evidence, after which it sentenced him to death. *Id.* at ¶ 22-26, 60. This court affirmed Mink's death sentence and he was eventually executed as he had requested, *see id.* at ¶ 26, but because the trial court had insisted on and had conducted a thorough, evidence-based process, we were

not left to doubt the constitutionality of Mink's death sentence with regard to his competency. We noted that the trial court had gone "to great lengths" before finding him competent, *id.* at ¶ 59, and that the court had "fully protected Mink's constitutional rights in determining his competency," *id.* at ¶ 61.

{¶ 225} Perhaps not every decision a defendant in a capital case makes that is against his or her interest should trigger a competency evaluation, but it would behoove courts to proceed thoughtfully and cautiously. For example, a clinical examination might not be required when a defendant wishes to waive representation by counsel. When making a decision like that, the defendant still has procedural and substantive protections in place. Courts should seek to examine a defendant's competency in view of the context and purpose of the proceeding. Therefore, competency evaluations should be specifically tailored to address the capacity and the ability of the defendant to understand the ramifications of the specific adverse-interest request he or she is making. *See Westbrook v. Arizona*, 384 U.S. 150, 150-151, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966).[4]

---

4. *See also* the trial court's "Decision and Entry Finding the Defendant Competent to Waive the Presentation of Mitigating Evidence," in *State v. Mink*, Montgomery C.P. No. 2000-CR-2900 (June 28, 2001):

> Applying the criteria set forth in *State v. Ashworth* (1999), 85 Ohio St.3d 56, [706 N.E.2d 1231,] and Based upon the Court's inquiry of the Defendant conducted in open court and the competency reports of Dr. Thomas O. Martin and Dr. Kim Stookey, the Court finds that the Defendant:
> 1.) Understands the choice between life and death,
> 2.) Has the ability to make a knowing and intelligent decision not to pursue the presentation of evidence,
> 3.) Fully understands the ramifications of his decision,
> 4.) Possesses the ability to reason logically, i.e. to choose means that relate logically to his ends,
> 5.) Understands his right to present mitigating evidence,
> 6.) Understands the meaning of mitigating evidence,
> 7.) Understands the importance of mitigating evidence,
> 8.) Understands the use of mitigating evidence to offset the aggravating circumstances and,
> 9.) Understands the effect of failing to present mitigating evidence.
> The Court further finds that the Defendant's decision to waive the presentation of mitigating evidence is made knowingly, intelligently and

{¶ 226} Additionally, requiring that a record be developed when a defendant invokes an adverse-interest request ensures balance in the system. If Lawson had been asked further questions, his suicidal ideation and suicide attempt may have become known to the court, as counsel presumably were aware of those matters. At that point, any court would certainly have sought further information about the defendant's mental health and capabilities before allowing the trial to proceed for the state to seek his execution. *See Ashworth*, 85 Ohio St.3d at 64, 706 N.E.2d 1231 (noting the state's interest "in not allowing the death penalty statute to be used as a means of state-assisted suicide").

{¶ 227} Because we must ensure rigorous compliance with constitutional standards in capital cases, I cannot concur in affirming Lawson's death sentences under our current framework of analysis.

## II. The Validity of Lawson's Jury-Trial Waiver and Guilty Pleas

{¶ 228} Insofar as Lawson's claims that his waiver of a jury trial and pleas of guilty were not done knowingly, voluntarily, and intelligently, for the same reasons articulated above that the court should have ordered a competency examination, I cannot concur in the majority's conclusion that the record supports that Lawson's pleas were fairly entered, underpinned by an adequate ability to reason and understand the proceedings against him.

{¶ 229} In accepting the waiver and pleas, even if the trial court had complied with *State v. Ballard*, 66 Ohio St.2d 473, 423 N.E.2d 115 (1981), paragraph one of the syllabus, and with Crim.R. 11, and even if the trial court had sufficiently inquired about Lawson's use of medications, Lawson was never asked why he wanted to enter the guilty pleas; his answer to that question may have clarified his lack of perceived or real duress, delusion, misunderstanding, or suicidal motivation.

---

voluntarily. The Court therefore accepts the Defendant's decision to waive the presentation of mitigating evidence.

**{¶ 230}** For these reasons, this court should be encouraging trial courts to thoroughly and appropriately examine a defendant's competency and state of mind when the defendant makes an adverse-interest request—such as pleading guilty to one or more capital offenses—rather than tolerating trial courts' failures to comply with R.C. 2945.37(B).

### III. Conclusion

**{¶ 231}** Because this court should not endorse a death sentence when the constitutionality of a defendant's convictions remains in doubt, I respectfully dissent from the majority's judgment. I would reverse Lawson's convictions and the sentences of death. I would further remand this case for the trial court to order a competency examination that it contemplated ordering before it accepted Lawson's guilty pleas and to hold a hearing based on the findings and recommendations contained in that evaluation, in accord with what I believe this court's holding should be, as expressed in this dissenting opinion.

_____

Brigham M. Anderson, Lawrence County Prosecuting Attorney, and Stephen E. Maher and Margaret S. Moore, Special Assistant Prosecuting Attorneys, for appellee.

Thomas A. Rein and Robert A. Dixon, for appellant.

_____